UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY, KANSAS

| | |
|---|---|
| MARK ARNOLD, as Special Administrator and Duly-Appointed Representative of the Estate of Ciara Howard and on Behalf of Ciara Howard, Deceased, and Her Heirs,<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF OLATHE, KANSAS;<br><br>MICHAEL BUTAUD,<br>in his individual capacity;<br><br>CHAD MELLICK,<br>in his individual capacity;<br><br>WADE LANPHEAR,<br>in his individual capacity;<br><br>TIM SWEANY<br>in his individual capacity;<br><br>IAN MILLS,<br>in his individual capacity;<br><br>BRIAN WESSLING,<br>in his individual capacity;<br><br>STEVE MENKE, Police Chief<br>in his official and individual capacity;<br><br>COUNTY OF JOHNSON, KANSAS and BOARD OF COMMISSIONER OF THE COUNTY OF JOHNSON, KANSAS;<br><br>NATE DENTON,<br>in his individual capacity;<br><br>JAMESON MILLER,<br>in his individual capacity;<br><br>THOMAS CHAULK,<br>in his individual capacity; | Case No.: 2:18-cv-02703 |

|  |  |
|---|---|
| **TAMARA SPARKS,**<br>**in her individual capacity,**<br><br>**CALVIN HAYDEN, Sheriff**<br>**in his official and individual capacities,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT
**(Violation of Civil Rights Under United States Constitution and Assault and Battery and Wrongful Death under the Laws of the State of Kansas)**

Plaintiff, Mark Arnold, Special Administrator of the Estate of Ciara Howard, brings the present civil rights case and demands a jury trial on all claims stated in this Complaint. For his causes of action against the Defendants, Tim Sweany; Michael Butaud; Chad Mellick; Wade Lanphear; Ian Mills; Brian Wessling; Nate Denton;; Jameson Miller; Thomas Chaulk, Tamera Sparks;  Police Chief Steve Menke;  Sheriff Calvin Hayden; County of Johnson, Kansas and Board of Commissioners of the County of Johnson; and City of Olathe, Kansas; Plaintiff states as follows:

### PRELIMINARY STATEMENT AND INTRODUCTION

1. On August 23, 2017, officers of the Olathe Police Department and deputies of the Johnson County Sheriff's Office, shot and killed Ciara Howard, a 26-year-old mother who suffered from mental illness, during a recklessly executed siege.  Ciara Howard, who was obviously agitated and mentally unstable, was in the home of her boyfriend, Larry Summer, in Olathe, Johnson County, Kansas.  Despite the explicit warnings of the Sheriff and tactical team commanders about the dangers of entering the house, and in direct violation of police policies and protocols, the Defendant officers and deputies, who were wearing bulletproof vests and escorted by a barking police attack dog, used a battering ram to smash through the front door of the home and, with firearms drawn, forced themselves into the house and then into the small laundry room where Ms. Howard had barricaded herself.  In doing so, they knowingly provoked an unnecessary and deadly confrontation with Ms. Howard, who had her boyfriend's handgun and was threatening suicide.  Mark Arnold, the Special Administrator of her Estate, seeks damages for the violation of Ms. Howard's civil rights under the Fourth and Fourteenth Amendments, for Defendants' reckless, deliberate and unlawful entry into the house, use of excessive force, failure to supervise and the deficient policies and training that caused the officers and deputies to create their own "jeopardy" and which led directly to the shooting and brutal death of Ms. Howard.

### JURISDICTION

2.  Jurisdiction is conferred by 28 U.S.C. § 1331 and 1343, which provide for original jurisdiction of this Court in suits based respectively on federal questions and authorized by 42 U.S.C. § 1983, to redress the deprivation under color of state law, statute, ordinance, regulation, custom or usage of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.  This Court has supplemental jurisdiction to hear Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3. Plaintiff's actions for damages are authorized by: (a) 42 U.S.C. § 1983, which provides for redress for the deprivation under color of any statute, ordinance, regulation, custom or usage of any state or territory of any rights, privileges or immunities secured to all the citizens or persons within the jurisdiction of the United States; (b) the Fourth and Fourteenth Amendments of the United States Constitution; (c) 42 U.S.C. § 1988, which authorizes Plaintiff's application for attorneys' fees and provides that a court may award a reasonable attorneys' fee as part of costs in any action or proceeding to enforce a provision of 42 U.S.C. § 1983; and the common laws and statutes of the State of Kansas.

4. Venue is proper in the United States District Court for the District of Kansas under 28 U.S.C. § 1391(a)(2), as the events or omissions giving rise to Plaintiff's claims occurred in Olathe, Johnson County, Kansas.

## THE PARTIES

5. Plaintiff, Mark Arnold, is presently, and was at all times relevant to this Complaint, a citizen of Gardner, Johnson County, Kansas. He is the husband of Ciara's Howard's mother, Kathy Arnold, and the Special Administrator of the Estate of Ciara Howard.

6. Defendant City of Olathe, Kansas, was created by, and established under, the laws of the State of Kansas. It is authorized to sue or be sued in its corporate name.

7. Defendants, Deputy Police Chief, Michael Butaud; Police Sergeant, Chad Mellick; Police Major, Wade Lanphear; Police Sergeant, Tim Sweany; Police Officer, Ian Mills; and Police Sergeant, Brian Wessling at all times relevant to the conduct alleged in this Complaint, were sworn law enforcement officers with the Olathe Police Department. They are sued in their individual capacities.

8. Defendant, Police Chief Steve Menke, was and is the final policymaker for the Olathe Police Department. He is sued in his official and individual capacities.

9. Defendant Johnson County, Kansas, was created by, and established under, the laws of the State of Kansas. It is authorized to sue or be sued in its corporate name.

10. Defendant Board of Commissioners for the County of Johnson, Kansas and County of Johnson, Kansas (collectively "Board"), were created by, and established under, the laws of the State of Kansas and are authorized to sue or be sued in their own corporate names.

11. Defendants, Deputy Nate Denton; Deputy Jameson Miller; Deputy Thomas Chaulk, and Deputy Tamara Sparks at all times relevant to the conduct alleged in this Complaint, were sworn law enforcement deputies with the Johnson County Sheriff's Office. They are sued in their individual capacity.

12. Defendant Calvin Hayden, was and is the Sheriff of Johnson County, Kansas and final policymaker for the Johnson County Sheriff's Department. He is sued in his official and individual capacities.

13. All of the Defendants, at all times material to this Complaint, acted under color of state law.

## FACTUAL BACKGROUND

14. On the afternoon of August 23, 2017, Ms. Howard was alone in her boyfriend, Larry Sumner's house at 112 S. Keeler St., Olathe, Johnson County, Kansas. Ms. Howard suffered from disabling mental health problems, including severe depression, bipolar disorder and addiction. She was known by the local law enforcement officers, several of whom knew her on a first-name basis, because of her mental health issues, including past suicidal behavior, and minor, non-violent offenses. Ms. Howard had walked away from a residential center where she had been required to report as a condition of her probation.

15. At approximately 3:00 p.m., the Johnson County Sheriff deputies joined the Olathe police officers attempting to serve an arrest warrant for non-violent, minor charges on Ms. Howard at the house. More than a dozen officers and deputies, many already in black, armored vests, gathered at the scene and blocked off the road with their squad cars. They knew her warrant was for walking away from the county's adult residential facility center where she had been required to report after her latest conviction. They knew from speaking with Mr. Sumner, who also stood in the perimeter outside the house, that Ms. Howard definitely had access to his .45-caliber handgun, which she was playing with the previous night and that the handgun was loaded. They knew that "it's not worth getting into a shootout and hurting an officer or hurting her over the warrants [for non-violent offenses] we have."

16. Olathe Police Sergeant, Defendant Sweeny, spoke to Ms. Howard from outside the house, telling her that the house was surrounded, she could not get out, and that they were going to be getting a warrant for the house to come in and drag her out. Defendant Sweany threatened that "there will most likely be a dog sent in which will result in you getting dog bit and potentially other people getting hurt as well."

17. A county deputy and Sergeant Sweany discussed whether or not to go in and the fact that Sheriff Calvin Hayden, was "not on board with" entering the house. At 3:45 p.m., both agencies called for their respective special tactical units that specialize in engaging with barricaded armed subjects, but the special tactical teams declined to come. Like Sheriff Hayden, the tactical team commanders reasoned that it was not worth the life-and-death risk to go inside the house with lethal force. Deputies, including Defendant Sparks, discussed that if they left the scene, "word would get out" and "they're going to freakin' barricade up with a weapon, and we're just going to keep walking away."

18. At 4:15 p.m., Defendant Sweany attempted to negotiate with Ms. Howard. Rather than requesting and using a crisis negotiator or mental health expert, Defendant Sweany along with Defendant Wessling convinced Ms. Howard's boyfriend, Mr. Sumner, to act as their negotiator, when they knew that doing so was in violation of established policies and protocol. They took Mr. Sumner to a spot near the back of the house to try to coax Ms. Howard to come out, which caused Ms. Howard to become more distressed. Ms. Howard would not come out of the house, saying she was sick of doing time. When it became clear Ms. Howard would not listen to her boyfriend who she irrationally believed was conspiring against her with the police, Defendant Sweany warned her that the longer it went on, the longer she would be in jail. Ms. Howard, who was

spotted hiding underneath a bed, rambled wildly: "I want to f—-in' die. . . I don't want to live." Defendants knew that advancing into the house would likely result in "civil liability" for "suicide and/or homicide."

19. The officers and deputies became impatient. Some were overheard saying "Jimmy John's delivers"; "I've got a grill"; "Maybe some lawn chairs?" Meanwhile, Ms. Howard shouted from inside the house "I'm not afraid to die!" Ms. Howard shouted. "I'm ready!"

20. At approximately 5:30 p.m., Sergeant Sweany announced to Ms. Howard that her time was up and prepared a squad of officers and deputies for a siege. Armed with bullet proof vests, loaded firearms and a German Shepard police dog, and with Sergeant Sweany in the lead position brandishing a riot shield, Defendant Sweany, Mellick, Mills, Denton, Miller, and Chaulk, then broke through the front door of the house with a battering ram, swept the rest of the house to ensure no other occupants were present and confirmed that Ms. Howard was alone in a small laundry room in the back of the house. Supervising Defendants on the scene, including Deputy Chief Butaud and Major Lanphear, permitted and condoned the unlawful entry and themselves participated in the siege by entering the house and assisting the officers and deputies.

21. Distraught and agitated, Ms. Howard yelled through the locked door that she was only in her nightgown and repeated that she would kill herself if they came into the laundry room. Defendant Sweany, in turn, threatened to release the attack dog and had Defendant Mills, the canine officer, prod the dog to bark in a menacing manner. At one point, Ms. Howard opened the door slightly, talked to and then barked back at the dog and childishly responded that the dog "started" it. Ms. Howard stated "You're not even real cops." Suddenly, and without warning, Defendant Sweany broke the door of the laundry room open and barged in behind his riot shield.

22. For 13 harrowing seconds, Ms. Howard stood shouting and trembling in the small room in her turquoise nightgown aimlessly waiving a gun in her hand amid screams to drop her gun from Defendant Sweany, Defendant Mellick and Defendant Denton, who took cover behind Sweany's riot shield and the door while pointing their firearms at Ms. Howard. Ms. Howard did not drop the gun, and the officers and deputy opened fire. Their bullets struck Ms. Howard, who pitched forward and fell to the concrete floor.

23. The squad members, in stunned voices, called for medical help. One of the deputies who fired put on gloves and dragged Ms. Howard into the hallway. He pleaded, "Breathe, Breathe, Ciara. Breathe." But another officer standing over her recognized, "She's gone."

24. Several other officers and deputies, including Defendant Sparks and Defendant Wessling, were outside the house when the shooting occurred. They neither took steps to stop Defendant Sweany and the attack squad from entering in an unsafe manner that was contrary to both Sheriff Hayden's and the tactical team commanders' orders and the agencies' standard operating procedures, nor offered proper assistance to Defendant Sweany and the squad in using less than lethal means to place Ms. Howard under their control. All of them, including the squad that breached the house, raised the level of the confrontation from a non-lethal one to a lethal one, placed Ms. Howard's boyfriend into an ill-fated role of negotiator and failed to obtain assistance from a trained negotiator or mental health expert.

25. Following Ms. Howard's death, the Olathe Police Department contacted Kathy Arnold, Ms. Howard's natural mother, and Mark Arnold, Mrs. Arnold's husband, and falsely informed them that Ms. Howard had raised, leveled and aimed the handgun with both arms at the officers and deputies in deliberate fashion and forced the officers and deputies to fire and shoot to kill.

26. Around the same time, the agencies conducted an internal affairs investigation that concluded the officers and deputies followed all procedures and protocols during the incident. Accordingly, the officers and deputies, including Defendants Sweany, Mellick and Denton were completely exonerated. None of the Defendants were criminally charged, suspended or fined by their agencies or disciplined in any way.

27. The Olathe Police Department and Johnson County Sheriff's Office refused to allow Mr. and Mrs. Arnold to view the video and audio recordings of the standoff or the shooting captured by the various body cameras and dashboard cameras used by the officers and deputies.

28. The Olathe Police Department and Johnson County Sheriff's Office would not even provide the materials sought by the Arnolds to the Kansas City Star Newspaper, which tried to obtain them through an open records request and were stymied by responses that the materials could not be released.

29. The agencies only capitulated and provided the materials to the Kansas City Star Newspaper several months later, after the Kansas City Star Newspaper filed a lawsuit to enforce the open records request on December 14, 2017.

30. It was only at that time that the Arnolds were able to begin to comprehend and understand the botched operation that led to the death of their mentally-ill daughter. Desiring a complete view of the incident, the Arnolds then served their own open records requests to the agencies on May 16, 2018, lawfully requesting all the bodycam and dashcam videos from the incident, including the materials the agencies provided to Kansas City Star Newspaper in the lawsuit. To date, the Arnolds' open records requests have gone unanswered.

31. The actions of all Defendants grossly violated widely accepted law enforcement standards on crisis intervention and the use of force. Defendants, knowing that Ms. Howard was mentally ill and in crisis, failed to use a trained negotiator or trained mental health professional to communicate with Ms. Howard, failed to use chemical munitions or other less lethal means, and needlessly escalated the situation by setting a five-minute time limit and by forcibly entering Mr. Sumner's empty house and then the small laundry where Ms. Howard had barricaded herself when there was no "triggering event" and no exigent circumstances. All of these factors, specifically the decision to breach the house and then the small enclosed laundry room with a squad of armed officers and deputies and an attack dog to subdue a mentally-ill and isolated person contradicted nationally recognized tactical standards and the orders of the agencies' commanders and gave rise to "officer-created jeopardy," meaning that the police and deputies themselves created the dangerous circumstances that purportedly placed them in jeopardy and which allegedly caused them to feel threatened and use force.

32. The Defendants' grossly mismanaged and reckless attempt at crisis intervention and the their use of excessive force was a direct result of a failure to properly train, guide, and supervise the police department's officers and the Sheriff's Office deputies. Chief Steve Menke, Deputy

Police Chief Butaud, Major Lanphear, and Sheriff Hayden knew that their subordinates were insufficiently trained in tactical operations and knew that their subordinates' entry into the house under the circumstance as they existed exposed Ms. Howard to the risk of bodily harm and death. Yet, despite their knowledge of the risk to Ms. Howard's life, Defendants Menke, Butaud, Lanphear, and Hayden allowed, permitted, and/or authorized their subordinates' unconstitutional actions; recklessly failed to intervene to stop the use of excessive force and failed to discipline their subordinates, thereby condoning those unconstitutional acts.

33. The policies, procedures, practices, and customs of Chief Menke and the Olathe Police Department and Sheriff Hayden and the Johnson County Sheriff's Office, with respect to potential claims of excessive force by citizens, is to conduct investigations designed to exonerate and protect the officers involved rather than discover the true facts of the incident and make an appropriate determination of whether or not the officer or deputy may have violated a citizen's constitutional rights and broken the law.

34. All Defendants knew or should have known that their conduct violated clearly established statutory or constitutional rights. All Defendants acted at all times under the color of state law.

35. As a result of Defendants' wrongful actions, Ms. Howard suffered extreme terror, severe pain, emotional trauma, and death under violent and tragic circumstances.

## Count I

**Claim Against Defendants Sweany, Mellick, Mills, Denton, Miller and Chaulk for the Unconstitutional Use of Excessive Force in Violation of the Fourth and Fourteenth Amendments and 42 U.S.C § 1983**

Plaintiff Arnold realleges the foregoing and further states as follows:

36. Defendants, Sweany, Mellick, Mills, Denton, Miller and Chaulk, acting under color of state law, intentionally and/or recklessly shot and killed Ms. Howard. The force employed was objectively unreasonable. Ms. Howard did not indicate she intended to use her weapon and never fired her weapon against them when they, from behind the cover of a riot shield and the door, fired their guns and killed her.

37. Further, the actions of Sweany, Mellick, Mills, Denton, Miller, Chaulk and all Defendants created the very situation that allegedly placed them in jeopardy. Indeed, the actions of all Defendants grossly violated widely accepted law enforcement standards on crisis intervention and the use of force. Defendants, knowing that Ms. Howard was mentally ill and in crisis, failed to use a trained negotiator or trained mental health professional to communicate with Ms. Howard, failed to use chemical munitions or other less lethal means, and needlessly escalated the situation by issuing loud and forceful commands at Howard, threatening to let the dog loose, setting a five-minute time limit and by forcibly entering Mr. Sumner's house when there was no "triggering event" and no exigent circumstances. At no time did Howard verbally or physically threaten Defendants. All of these factors, along with the decision of Sweany and the squad to breach the house and then the small laundry room where Ms. Howard had barricaded herself contradicted nationally recognized tactical standards and their commanders' orders and gave rise

to "officer-created jeopardy," meaning that the police and the deputies themselves created the dangerous circumstances that purportedly placed them in jeopardy and which allegedly caused them to feel threatened and use force.

38. Defendants proceeded according to a hastily scripted tactical plan that was substandard in many respects, and then did not even follow that plan. They also violated numerous widely accepted standards for tactical police operations.

39. Moreover, the officers and deputies who did not join the squad in the siege observed and had reason to know Sweany, Mellick, Mills, Denton, Miller and Chaulk were using excessive force and/or that they were acting in a manner that would give rise to a use of excessive force, in violation of Ms. Howard's rights under the Fourth and Fourteenth Amendments.

40. All of the officers and deputies participated in escalating the situation and in unlawfully entering Mr. Sumner's house and then the small laundry room where the suicidal and armed Ms. Howard had barricaded herself— without a warrant and in the absence of exigent circumstances. They used a battering ram to knock down Mr. Sumner's door and then crashed through the locked laundry room door after threatening to release the barking attack dog, provoking an unnecessary and violent confrontation with an isolated, distraught, anxious, mentally ill, suicidal woman with a loaded handgun.

41. All of the officers and deputies had an affirmative duty to intervene to prevent the circumstances that gave rise to "officer-created jeopardy" and to prevent the use of excessive force.

42. The harm to Ms. Howard was preventable and her death was avoidable. The Defendants had a realistic opportunity to intervene in the chain of events and prevent the harm from occurring.

43. Defendants failed to intervene and protect Ms. Howard from the unnecessary escalation of the situation, including the unnecessary warrantless entry and resulting use of force.

44. The actions of all Defendants, acting individually and/or in concert, were wanton and malicious and subjected Ms. Howard to an unreasonable seizure in violation of her rights under the Fourth and Fourteenth Amendments to the Constitution of the United States. Defendants' actions deprived Ms. Howard of her life, in violation of her substantive right to life under the Due Process Clause of the Fourteenth Amendment.

45. The actions of the Defendants proximately and directly caused Ms. Howard's injuries and death.

46. At all times relevant to this Complaint, the officers and deputies were employees of the Olathe Police Department and the Johnson County Sheriff's Department, respectively. Defendants, Butaud, Mellick, Lanphear, Sweany, Mills, and Wessling,, acted under the supervision of Chief Menke, the final policymaker for the Olathe Police Department and Defendants, Denton, Miller and Chaulk and Sparks, acted under the supervision of Sheriff Hayden, the final policy maker of the Johnson County Sheriff's Office.

47.  Chief Menke and Sheriff Hayden improperly and recklessly supervised their officers and deputies, resulting in the death of Ms. Howard. In fact, they recklessly and needlessly escalated the situation and failed to provide proper leadership and supervision consistent with the police department's policies and Sheriff's Office policies and nationally recognized law enforcement standards. Defendant Menke and Defendant Hayden failed to provide Defendants with adequate training and supervision, directly resulting in Ms. Howard's injuries and death.

48.  Defendants' actions throughout the incident were not only reckless, but were also wanton and malicious, thus justifying an award of punitive damages.

## Count II

### Monell Claim Under 42 U.S.C. § 1983 Against
### Defendant City of Olathe, Defendant Johnson County, Kansas and Defendant Board of Commissioners of Johnson County

Plaintiff Arnold realleges the foregoing and further states as follows:

49. Police Chief Menke is the final policymaker for the Olathe Police Department and, thus, for the City of Olathe in matters delegated or entrusted to him. Sheriff Hayden is the final policy maker for the Johnson County Sheriff's Office and thus, for Johnson County, Kansas and the Board of Commissioners for Johnson County in the matters delegated or entrusted to him.

50.  Both before and at the time of the events alleged in this Complaint, the Olathe Police Department and the Johnson County Sheriff's Office had policies, practices, customs and procedures which operated to deprive Ms. Howard of her constitutional rights under the Fourth and Fourteenth Amendments.

51.  Police Chief Menke and the City of Olathe and Sheriff Hayden, Johnson County Sheriff's Office and Johnson County, Kansas are accountable under 42 U.S.C. § 1983 because they established policies and practices that were intended to and did encourage, endorse, and permit their agents and employees to violate the constitutional rights of Ms. Howard and other similarly situated persons. At a minimum, Chief Menke and the City of Olathe and Sheriff Hayden, Johnson County Sheriff's Office, and Johnson County, Kansas were deliberately and/or recklessly indifferent to such constitutional violations.

52.  The unconstitutional policies, practices, customs and procedures of Police Chief Menke and the City of Olathe and Sheriff Hayden, Johnson County Sheriff's Office and Johnson County, Kansas include, but are not limited to:

   a. A policy, practice, custom or procedure of failing to properly train and supervise officers to avoid the inappropriate and excessive use of force;

   b. A policy, practice, custom or procedure of failing to adequately train and supervise officers in the techniques of properly responding to critical incidents involving suicidal and mentally ill persons;

       c. The practice of using deadly force without regard to the need for the use of such force;

       d. A policy on the use of deadly force that fails to provide adequate guidance to officers;

       e. A practice or custom of not investigating whether an officer's use of force is justified;

       f. A practice or custom of not investigating whether tactical operation plans comply with reasonable police standards;

       g. A practice or custom of being deliberately indifferent to constitutional violations committed by law enforcement officers;

       h. A practice or custom of not following the police department's written policies on the use of force and tactical team operations; and

       i. A practice or custom of insubordination and disobeying the orders and instructions of their commanders and tactical team leaders.

53. Police Chief Menke and the City of Olathe and Sheriff Hayden, Johnson County Sheriff's Office and Johnson County, Kansas established, maintained, and used the policies, practices, customs, and procedures described above before and during the forcible entry into Mr. Sumner's house and during the shooting and killing of Ms. Howard.

54. These policies, practices, customs, and procedures, as described above, were implemented intentionally and/or recklessly to deprive citizens, including Ms. Howard, of their constitutional rights and were a direct and proximate cause of the constitutional violations and injuries set forth in this Complaint.

55. The constitutional violations committed by Defendants arose from circumstances constituting a usual and recurring situation.

56. Police Chief Menke's, the City of Olathe's, Sheriff Hayden's, Johnson County Sheriff's Office's and Johnson County, Kansas's and its board's inadequate training and supervision of their police officers directly caused the violations of Ms. Howard's constitutional rights under the Fourth and Fourteenth Amendments.

57. Police Chief Menke's, the City of Olathe's, Sheriff Hayden's, Johnson County Sheriff's Office's and Johnson County, Kansas's custom and practice of failing to enforce what policies did exist to protect Ms. Howard, and other citizens like her, was also a direct and proximate cause of the constitutional violations and injuries set forth in this Complaint.

### Count III

**Claim Under 42 U.S.C. § 1983 Against Defendants, Chief Menke, Sheriff Hayden, Deputy Chief Butaud, and Major Lanphear, Whose Acts and Omissions as Supervisors of**

**Defendants Sweany,, Mellick, Mills, Denton, Miller, and Chaulk, Resulted in the Violation of Ciara Howard's Constitutional Rights**

Plaintiff realleges the foregoing and states as follows:

58. Defendants, Sweany, Mellick, Mills, Denton, Miller and Chaulk used excessive force in entering Mr. Sumner's home and shooting Ms. Howard multiple times. The conduct of the other officers of the Olathe Police Department and deputies of the Johnson County Sheriff's Department contributed to the excessive force by their failure to follow departmental policies and accepted police practices and by their failure to protect Ms. Howard from grossly unreasonable and excessive force.

59. Defendants, Chief Menke, Sheriff Hayden, Deputy Chief Butaud and Major Lanphear intentionally and purposefully, through their own individual actions, caused the violation of Ms. Howard's constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment and the violation of her substantive right to life under the Fourteenth Amendment to the Constitution of the United States. By allowing and approving an operational plan that made no provision for a mental health professional or less than lethal means of apprehension, and by failing to ensure that the officers and deputies under their supervision would follow policies and protocol and proceed according to a sound tactical plan, Defendants recklessly and intentionally instigated events leading to the use of excessive force and Ms. Howard's death.

60. As a direct result of Defendant Chief Menke's, Sheriff Hayden's, Deputy Chief Butaud's and Major Lanphear's acts and omissions, Ms. Howard suffered damages, including the loss of her life.

**Supplemental State Law Claims**

61. With regard to the State law claims, Defendants Sweany, Butaud, Mellick, Lanphear, Mills, Wessling and Menke, not only acted at all times under color of state law but as agents or employees of the City Olathe, Kansas. The City of Olathe is therefore liable under the doctrine of *respondeat superior*. Alternatively, with regard to intentional torts, the City of Olathe is liable for the failure to properly train, supervise and discipline its employees, and/or to establish appropriate policies, as described above.

62. With regard to the State law claims, Defendants Denton, Miller, Chaulk, Sparks and Hayden not only acted at all times under the color of state law, but as agents or employees of the Board of Commissioner of Johnson County. The Board of Commissioners of Johnson County is liable under the doctrine of *respondeat superior*. Alternatively, with regard to intentional torts, the Board of Commissioners of Johnson County, through its Sheriff's Department is liable for the failure to properly train, supervise and discipline its employees, and/or to establish appropriate policies, as described above.

63. With regard to the State law claims, Plaintiff exhausted administrative remedies and satisfied the Kansas Tort Claims Act by providing notice of the State law claims to Defendants and filing said claims after Defendants failed to respond within the requisite period.

**Count IV**

**Claim Under the State Law of Kansas Against Defendants, Sweany, Mellick, Mills, Denton, Miller and Chaulk for Assault and Battery**

Plaintiff realleges the foregoing and states as follows:

64. Defendants, Sweany, Mellick, Mills, Denton, Miller and Chaulk forced entry into the room where Ms. Howard was isolated and aimed loaded handguns at Ms. Howard intending to cause harmful and/or offensive contact to Plaintiff.

65. Within seconds of entering the room, Defendants, Sweany, Mellick, Mills, Denton, Miller and Chaulk, acting individually and in concert, opened fire striking Ms. Howard multiples times all over her body, causing harmful offensive contact to her person and ultimately killing her before medical personnel even arrived.

66. By entering the home with an overwhelming show of force including the brandishing of weapons, bullet proof vests, assault rifles, attack canines and riot shields, Defendants intentionally threatened or attempted to do bodily harm to Ciara Howard, resulting in the Howard suffering the immediate apprehension of bodily harm.

67. In addition to placing the Ciara Howard in a reasonable apprehension of bodily harm, Defendants increased their show of force by forcing entry into the small, isolated laundry room where Ciara Howard stood one against three officers yelling, screaming, and brandishing a riot shield and loaded handguns just feet from Howard who's back was against the wall.

68. The assault and batteries committed on Howard, as alleged in this Count, were committed by said Defendants in the scope and performance of their duties as employees of the Olathe Police Department (and thus the City of Olathe) and the Johnson County Sheriff's Office and the Board of Commissioners of Johnson County.

69. The assault and batteries committed on Ciara Howard were authorized in advance and/or ratified after the fact by Defendants Chief Menke and Sheriff Hayden.

70. The assault and batteries described herein were conducted without legal privilege and in violation of clearly defined policy that governed the handling of barricaded subjects.

71. The assault and batteries described herein violated Ciara Howard's rights under the Fourth and Fourteenth Amendment of the United States Constitution.

72. The acts of Defendants, as set forth in this Count, were willful, wanton, or done with malice or reckless disregard for Ciara Howard's rights. Accordingly, Plaintiff is entitled to an award of punitive damages against each Defendant in an amount to be determined at trial.

73. As a result of the acts and omission of Defendants, as set forth in this Count, Ciara Howard suffered permanent bodily injuries including multiple gunshot wounds leading to death.

74. The individual Defendants are each liable, individually and jointly, for the harm to Ciara Howard, and the City of Oalthe and Board of Commissioners of Johnson County is liable for the harm to Howard under the doctrine of *respondeat superior*.

### Count V

**Claim Under the State Law of Kansas Against all Defendants for Wrongful Death**

Plaintiff realleges the foregoing and states as follows:

75. Mark Arnold, as Special Administrator of the Estate of Ciara Howard, as well as an heir at law, seeks on behalf of Ciara Howard's estate and other heirs at law compensation for wrongful death and a survival claim.

76. Defendants, each of them, individually and in their official capacities through their non-discretionary acts and omissions and directly and proximately caused the death of Ciara Howard.

77. Plaintiff, the Estate of Ciara Howard, and her remaining heirs at law have suffered damage in the form of the loss of a daughter, mother, sister, and provider.

78. Plaintiff seeks compensatory damages for Ciara Howard's estate as well as her heirs at law and punitive damages, as to each individually named defendant other than the governmental entities, for the costs, and for such other damages as the Court may deem just and equitable.

### CLAIM FOR DAMAGES

79. As to Counts I - III, the wrongful actions of Defendants deprived Ms. Howard of her civil rights under the Fourth and Fourteenth Amendments.

80. As to Counts I - III, the Estate of Ciara Howard is entitled to compensatory damages for medical and burial expenses, pain and suffering before death, loss of earnings based upon the probable duration of Ms. Howard's life had the injury not occurred, Ms. Howard's loss of consortium, and other damages recognized in common law tort actions but not duplicative of those for her wrongful death.

81. As to Counts I and III, Defendants' actions were deliberate, reckless, wanton, malicious and/or cruel, which justifies an award of punitive damages.

82. As to Counts IV and V, Defendants' actions caused Ms. Howard severe apprehension, emotional distress, anguish and pain prior to her death and her tragic death, and her family suffered and will continue to suffer from their loss.

83. As to Count IV and V, the Estate of Ciara Howard is entitled to compensation for the damages and losses resulting from the assault and battery and from her wrongful death, including Ms. Howard's distress, anguish and pain prior to death; the family's loss of her filial care, attention and protection; loss of the earnings she would have contributed during the remainder of her expected lifetime; expenses for her care caused by the injury; reasonable funeral expenses; mental anguish, suffering and bereavement; loss of her society; loss of her comfort; and loss of her companionship; and all other elements of damages under the intentional tort and wrongful death laws of Kansas.

84. As to Counts IV and V, Defendants' actions were willful, wanton, or done with malice or reckless disregard for Plaintiff's and Ms. Howard's rights, which justifies an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

1. That this Court assume jurisdiction of this cause to determine this controversy and set this case for hearing on the merits.

2. The award of compensatory damages to Plaintiff Arnold as Special Administrator for the Estate of Ciara Howard for the violation of Ms. Howard's civil rights in the amount of no less than $1,000,000.

3. The award of compensatory damages to Plaintiff Arnold as Special Administrator for the Estate of Ciara Howard for Ms. Howard's wrongful death/survival in the amount of no less than $1,000,000.

4. The award of punitive damages against Defendants, jointly and severally, in the amount of $2,000,000.

5. That this Court, pursuant to 42 U.S.C. § 1988, allow the Plaintiff costs, expenses and attorneys' fees, and also grant such alternative relief as may seem to the Court just, proper, and equitable.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.

## PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the place of trial.

Respectfully submitted,

/s/ Andrew S. LeRoy
Andrew S. LeRoy, Esq. (D. Kan. No. 25209)
Jose M. Bautista, Esq. (D. Kan. No. 78500)
BAUTISTA LEROY LLC
3770 Broadway Blvd.
Kansas City, Missouri 64111
Tel:  (816) 221-0382
Fax:  (800) 816-7060
Email:  jose@bautistaleroy.com
Email:  andrew@bautistaleroy.com