# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARK ARNOLD,                          )
                                      )
        Plaintiff,    )
                                      )
v.                                    )
                                      )          Case No. 18-2703-CM-JPO
CITY OF OLATHE, KANSAS, et al.,       )
                                      )
        Defendant.   )
_____ )

## MEMORANDUM AND ORDER

This case arises out of the tragic shooting death of Ciara Howard. Ms. Howard, who suffered from mental health and addiction problems, had walked away from a residential center. Because she was required to report to the center as a condition of her probation, an arrest warrant was issued. When Olathe police officers and Johnson County deputies arrived at Ms. Howard's boyfriend's home to serve the warrant, Ms. Howard refused to leave the house. Eventually, the officers entered the house and shot and killed Ms. Howard. The Special Administrator of Ms. Howard's Estate, Mark Arnold, filed this action, bringing 42 U.S.C. § 1983 excessive force claims and state law tort claims for assault/battery and survival/wrongful death against the officers, deputies, and their employers. Both groups of defendants—those associated with the Olathe police department (the "Olathe defendants") and those associated with the Johnson County Sheriff's Office (the "Johnson County defendants")— filed motions to dismiss. (Docs. 37 & 47.) Plaintiff initially sought discovery before responding to the motions, but the court denied that request and ordered plaintiff to respond. The motions are now ripe and the court is ready to rule.

## I.       Factual Background

The following facts are taken from plaintiff's complaint. Defendants have also submitted some evidence that they claim is referenced in and central to the complaint. *See Alcarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (noting that a court may consider documents referred to in the complaint if they are central to plaintiff's claims and undisputed). Some of that evidence may be considered (i.e., the Notice of Claim). Some of it may not (i.e., the affidavits that contradict the allegations in the complaint). In any event, the court has discretion whether to consider such evidence. *Lowe v. Town of Fairland, Okla.*, 143 F.3d 1378, 1381 (10th Cir. 1998). As necessary throughout this opinion, the court will identify pieces of evidence that it has or has not considered, in accord with governing standards.

With these standards in mind, the court now turns to the facts of the case—viewed in the light most favorable to plaintiff. The most succinct way to explain the facts is through the following chart of actors/defendants and timeline:

| **Name** | **Employer** | **Alleged Involvement** |
|---|---|---|
| Sergeant Tim Sweany | Olathe Police Department | Led entry into the house with a riot shield. Broke down the laundry room door. Was part of the group who opened fire on Ms. Howard. |
| Sergeant Chad Mellick | Olathe Police Department | Entered the house and was part of the group who opened fire on Ms. Howard. |
| Officer Jameson Miller | Olathe Police Department, although plaintiff erroneously identified him as a deputy for Johnson County | Entered the house with the group who opened fire on Ms. Howard. |
| Deputy Nate Denton | Johnson County Sheriff's Office | Entered the house and was part of the group who opened fire on Ms. Howard. |
| Deputy Thomas Chaulk | Johnson County Sheriff's Office | Entered the house with the group who opened fire on Ms. Howard. |
| Officer Ian Mills | Olathe Police Department | Canine Officer. Entered the house with police dog. |

| | | |
|---|---|---|
| Deputy Tamara Sparks | Johnson County Sheriff's Office | Was present outside before officers entered the house. Discussed with others that if they left the scene, "word would get out" and "they're going to freakin' barricade up with a weapon, and we're just going to keep walking away." Outside house when shots fired, but did not try to prevent others from entering the house. |
| Sergeant Brian Wessling | Olathe Police Department | Was present outside before officers entered the house. Convinced Ms. Howard's boyfriend to act as negotiator. Outside house when shots fired, but did not try to stop others from entering the house. |
| Deputy Chief Michael Butaud | Olathe Police Department | "[P]ermitted and condoned the unlawful entry and . . . participated in the siege by entering the house and assisting the officers and deputies." |
| Major Wade Lanphear | Olathe Police Department | "[P]ermitted and condoned the unlawful entry and . . . participated in the siege by entering the house and assisting the officers and deputies." |
| Chief Steve Menke (in both individual and official capacities) | Olathe Police Department | Supervisor. Not present at house. |
| Sheriff Calvin Hayden (in both individual and official capacities) | Johnson County Sheriff's Office | Supervisor. Not present at house. |

Despite the varying levels of involvement identified above, plaintiff's theory is that the collective actions of all the officers, deputies, and supervisors led to Ms. Howard's death. Plaintiff alleges that the defendants knew that Ms. Howard was mentally ill and in crisis. According to plaintiff, even those defendants who were not physically in the house during the shooting are responsible because they collectively raised the level of confrontation from a non-lethal one to a lethal one. They used Ms. Howard's boyfriend as a negotiator when they should have used a trained negotiator or mental health expert. And they did not attempt to stop Sergeant Sweany's unsafe entry of the house. Plaintiff claims that the following series of events led to "officer-created jeopardy," when there were other options that would not have resulted in Ms. Howard's death.

- Afternoon of August 23, 2017: Ms. Howard had walked away from her residential center and was alone in her boyfriend, Larry Sumner's, house at 112 S. Keeler St., Olathe, Johnson County, Kansas.

- 3:00 p.m.: Johnson County Sheriff deputies and Olathe police officers arrived at Mr. Sumner's house to serve an arrest warrant for Ms. Howard. Mr. Sumner advised officers that Ms. Howard had access to a .45-caliber handgun. Sergeant Sweany spoke to Ms. Howard from outside the house, telling her that the house was surrounded, she could not get out, and that they were going to be getting a warrant for the house to come in and drag her out. Sergeant Sweany threatened that "there will most likely be a dog sent in which will result in you getting dog bit and potentially other people getting hurt as well." A county deputy and Sergeant Sweany discussed whether to enter the house and the fact that Sheriff Hayden was "not on board" with entering the house.

- 3:45 p.m.: Both agencies called for their respective special tactical units that specialize in engaging with barricaded armed subjects, but the special tactical teams declined to come. The tactical team commanders reasoned that it was not worth the life-and-death risk to go inside the house with lethal force. Deputies discussed that if they left the scene, "word would get out" and "they're going to freakin' barricade up with a weapon, and we're just going to keep walking away."

- 4:15 p.m.: Sergeant Sweany and Sergeant Wessling convinced Mr. Sumner to negotiate with Ms. Howard, although that action violated established protocol and policies. Negotiation was unsuccessful. Ms. Howard became convinced that Mr. Sumner was conspiring with police. Sergeant Sweany warned Ms. Howard that the longer it went on, the longer she would be in jail. Ms. Howard, who was spotted hiding underneath a bed, rambled wildly: "I want to f——in' die. . . . I don't want to live." Defendants knew that advancing into the house would likely result in "civil liability" for "suicide and/or homicide."

- <u>After 4:15 p.m.</u>: The officers and deputies became impatient. Some were overheard saying "Jimmy John's delivers"; "I've got a grill"; "Maybe some lawn chairs?" Meanwhile, Ms. Howard shouted from inside the house "I'm not afraid to die" and "I'm ready!"

- <u>5:30 p.m.</u>: Sergeant Sweany announced to Ms. Howard that her time was up and prepared a squad of officers and deputies. The squad, which included Sweany, Mellick, Mills (and his police dog), Denton, Miller, and Chaulk, used a battering ram to break through the front door of the house. They swept the house for other occupancy and confirmed that Ms. Howard was alone in a small laundry room in the back of the house. Supervising officers on the scene, including Deputy Chief Butaud and Major Lanphear, permitted and condoned the entry, and also entered the house and assisted the officers and deputies.

- <u>After Entry of House</u>: The laundry room door was locked. Ms. Howard yelled that she was only in her nightgown and that she would kill herself if they came into the laundry room. Sergeant Sweany threatened to release the attack dog and had Officer Mills, the canine officer, prod the dog to bark in a menacing manner. Ms. Howard opened the door slightly, talked to and then barked back at the dog and said that the dog "started" it. Ms. Howard stated, "You're not even real cops." And then, without warning, Sergeant Sweany broke open the laundry room door and entered behind his riot shield.

- <u>After Entry of Laundry Room</u>: For thirteen seconds, Ms. Howard stood shouting and trembling in the laundry room, aimlessly waiving a gun in her hand while Sergeant Sweany screamed at her to drop her gun. Mellick and Denton took cover behind Sweany's riot shield and the door and pointed their firearms at Ms. Howard. Ms. Howard did not drop the gun, and the officers and deputy opened fire. Their bullets struck and killed Ms. Howard.

## II.     Legal Standards

Both groups of defendants—the Olathe defendants and the Johnson County defendants—ask for dismissal pursuant to Rule 12(b)(6). The court will grant a 12(b)(6) motion to dismiss only when the factual allegations fail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the factual allegations need not be detailed, the claims must set forth entitlement to relief "through more than labels, conclusions and a formulaic recitation of the elements of a cause of action." *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1216 (D. Kan. 2008). The allegations must contain facts sufficient to state a claim that is plausible, rather than merely conceivable. *Id.* "All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court construes any reasonable inferences from these facts in favor of the plaintiff. *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006).

The Olathe defendants labeled their motion as one alternatively for dismissal or for judgment on the pleadings. These defendants filed an answer before filing their motion. Technically, it is impermissible under the Federal Rules to submit an answer and thereafter file a Rule 12(b)(6) motion to dismiss. *See* Fed. R. Civ. P. 12(b) (stating that a motion to dismiss under the rule "shall be made before pleading if further pleading is permitted"). But Rule 12(h)(2) permits the court to consider "[a] defense of failure to state a claim upon which relief can be granted" within a Rule 12(c) motion for judgment on the pleadings. *See Swearingen v. Honeywell, Inc.*, 189 F. Supp. 2d 1189, 1193 (D. Kan. 2002). The distinction between the two rules is purely one of procedural formality and the court employs the same standard that it uses to analyze a Rule 12(b)(6) motion to dismiss to evaluate a Rule 12(c) motion for judgment on the pleadings. *Id.* (citing *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000)).

**III.    Discussion**

Because many of the issues overlap, the court takes up both motions to dismiss together. Where particular arguments only apply to certain defendants, the court will address those defendants individually.

### A. Standing/Real Party in Interest

The first issue the court addresses is one that both groups of defendants raise to varying degrees within their motions: plaintiff's standing. The Olathe defendants claim that plaintiff lacks standing to bring any claim because he is not the real party in interest. They argue that the order appointing plaintiff as Special Administrator of the Estate did not authorize him to bring the claims in this case. Similarly, the Johnson County defendants argue that plaintiff lacks standing to bring the wrongful death claim because he is not an "heir at law."

Although the term "standing" is used loosely in many contexts to denote the party with a right to bring a particular cause of action, technically "'standing pertains to suits brought by individuals or groups challenging governmental action which has allegedly prejudiced their interests. On the other hand, the real party in interest question is raised in those much rarer instances between private parties where a plaintiff's interest is not easily discernible.'" *Fed. Deposit Ins. Corp. v. Bachman*, 894 F.2d 1233, 1235 (10th Cir. 1990) (citation omitted). The issue before the court here is more one of whether plaintiff is a real party in interest than one of standing. But regardless of whether plaintiff is the real party in interest, dismissal or judgment on the pleadings is not the appropriate remedy. Fed. R. Civ. P. 17(a)(3) states:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

For § 1983 claims of a deceased party, the proper party is the estate of the victim. *Berry v. Muskogee*, 900 F.2d 1489, 1506–07 (10th Cir. 1990). It is a survival action, and like a state law survival action, cannot be brought by the decedent's heirs. *See Cory v. Troth*, 223 P.2d 1008, 1010 (Kan. 1950) (stating who can bring a Kansas survival action). In contrast, a Kansas wrongful death action "may be commenced by any one of the heirs at law of the deceased who has sustained a loss by reason of the death." Kan. Stat. Ann. § 60-1902.

Here, plaintiff is the Special Administrator of the Estate of Ciara Howard, appointed by the Probate Division of the Johnson County District Court. The order appointing plaintiff authorized him to:

> File a wrongful death action in the District Court of Johnson County, Kansas on behalf of decedent's estate, and serve as Special Administrator of decedent's estate throughout the course of the wrongful death action to Final Judgment or throughout the course of an appeal therefrom.

The question, then, is whether the order effectively limited plaintiff's right to bring this case in federal court. The court concludes that it did not. Allowing the order to dictate who may bring this action would result in no party being qualified. The order does not authorize a § 1983 or survival action at all. And it incorrectly authorizes plaintiff to bring a wrongful death action on behalf of the estate (when a wrongful death action belongs to the heirs). Alternatively, if the order does effectively limit plaintiff's authority, then it is something that would be remedied by substitution or joinder—not dismissal.

Plaintiff properly brings § 1983 claims as the representative of the estate. And although he is not an heir-at-law capable of bringing a wrongful death action, it appears that the heirs in this case have yet to be determined. Until that time, plaintiff is acting on behalf of the heirs. After they have been determined, they may be added as parties if appropriate.

Plaintiff may continue to pursue relief in this case. Ultimately, he may not be the proper party for all claims, but dismissal is not appropriate at this time.

### B.  Rule 8 and Collective Liability

The Olathe defendants claim that plaintiff's attempt at collective liability does not meet the pleading standards of Fed. R. Civ. P. 8.  They argue that plaintiff uses the general term "defendants" to identify who took actions, but does not specify which defendants took which actions.

Rule 8(a) requires that a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of this rule is to give the opposing party "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

Plaintiff's complaint meets this standard.  While at times plaintiff groups defendants together, at other times, plaintiff identifies particular defendants who took specific actions.  Where possible, the court will evaluate the actions of the defendants when considering whether they personally participated in the alleged deprivations of constitutional rights.  The court will not automatically accept that because plaintiff used the collective term "defendants," all defendants may be held responsible for the actions of others.  But the court will conduct this analysis when determining whether plaintiff has adequately alleged personal participation—not in determining whether plaintiff has met the pleading standards of Rule 8.  The burden of Fed. R. Civ. P. 8 is light, and plaintiff has met its standard.

### C.  Fourth Amendment v. Fourteenth Amendment

Both groups of defendants argue that plaintiff has not stated a claim for violation of the Fourteenth Amendment.  Plaintiff did not address this argument and made no effort to distinguish the Fourth Amendment claims from the Fourteenth Amendment claims.  The court determines that the Fourth Amendment is the proper avenue for plaintiff's excessive force claims, and dismisses plaintiff's claims under the Fourteenth Amendment to the extent they are an attempt to raise independent due

process claims. *See Estate of Booker v. Gomez*, 745 F.3d 405, 418–19 (10th Cir. 2014) (explaining the difference of when an excessive force claims falls under the Fourth, Fifth, Eighth, or Fourteenth Amendment).

### D. *Fourth Amendment Individual Capacity Claims*

Next, all defendants sued for Fourth Amendment violations in their individual capacities argue that they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials who perform discretionary government functions from liability for civil damages and the obligation to defend the action. *See Johnson v. Fankell*, 520 U.S. 911, 914 (1997); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity is only applicable, however, if the official's conduct did not violate clearly established constitutional or statutory rights that would have been known by a reasonable government official. *See Harlow*, 457 U.S. at 818; *McFall v. Bednar*, 407 F.3d 1081, 1087 (10th Cir. 2005). "In resolving a motion to dismiss based on qualified immunity, a court must consider whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (citing *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011)). Moreover, the inquiry is not whether the general right to be free from excessive force is clearly established—because it is—the inquiry is whether plaintiff had a clearly established right under the particular facts of this case. *Long v. Fulmer*, 545 F. App'x 757, 760 (10th Cir. 2013).

#### 1. Personal Participation

Before moving to the test for qualified immunity, the court must address another threshold issue: whether plaintiff has adequately alleged personal participation by each of the defendants. Plaintiff claims that he has done so in many instances by alleging that the collective actions of the

defendants resulted in the Fourth Amendment violation. Defendants maintain that plaintiff has failed to adequately allege personal participation by many of them because they were not present at the time of the shooting.

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). Liability under § 1983 cannot be based on supervisory status alone; there must be "an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Id*. (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)); *see also Dodds v. Richardson*, No. 09-6157, 2010 WL 3064002, at *8–10 (10th Cir. Aug. 6, 2010) (reviewing standards for § 1983 supervisory liability in light of *Iqbal*; holding stricter burden on plaintiff still requires affirmative link; plaintiff must establish (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation); *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993) (holding that a supervisor is not liable under § 1983 unless an "affirmative link" exists between the constitutional deprivation and the supervisor's personal participation).

"For liability under section 1983, direct participation is not necessary. Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008) (citing *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)). In terms of causation, the "requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id*. at 1279–80.

A defendant may also be found to personally participate for failure to intervene. *See, e.g.,*
*Estate of Booker*, 745 F.3d at 422–23; *Fogarty v. Gallegos*, 523 F.3d 1147, 1152 (10th Cir. 2008);
*Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996); *Reindl v. City of Leavenworth*, 443 F. Supp. 2d
1222, 1229 (D. Kan. 2006). But to be held responsible for failing to intervene, there must be a
"realistic opportunity" to intervene and reason to know that excessive force would be used—which,
according to defendants, was absent here. *Jones v. Norton*, 809 F.3d 562, 576 (10th Cir. 2015);
*Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008). And the constitutional
deprivation must occur in the defendant's presence. *Vondrak*, 535 F.3d at 1210.

### a. Deputy Sparks

Deputy Sparks was not present in the house when the shooting occurred. Instead, she was
outside the house and plaintiff alleges that she did not take steps to stop officers from entering the
house in an unsafe manner or to assist in using less than lethal means. (Doc. 1, at 5 ¶ 24.) Although
plaintiff alleges that Deputy Sparks should have intervened, he does not adequately allege that Deputy
Sparks had the reasonable opportunity to intervene. He has not alleged facts suggesting that Deputy
Sparks was in a position to know that the officers would use lethal force; observe the lethal force; or
intervene before the force was used. The court therefore dismisses the § 1983 claim against defendant
Sparks.

### b. Sergeant Wessling

Like Deputy Sparks, Sergeant Wessling was not present in the house. Plaintiff claims that
Sergeant Wessling was part of the team that convinced Mr. Sumner to act as a negotiator. While this
decision ultimately proved unsuccessful, plaintiff has not alleged how participating in that decision
directly or foreseeably led to the shooting of Ms. Howard. For the same reasons the court dismisses
Deputy Sparks, the § 1983 claim against Sergeant Wessling is also dismissed.

### c. Sergeant Mellick

Sergeant Mellick submitted an affidavit stating that he was not present in the house at the time of the shooting. But this affidavit is controverted by the allegations in plaintiff's complaint, and Sergeant Mellick has conceded that it may be ignored. (Doc. 66, at 5 n.3.) Plaintiff alleges that Sergeant Mellick was part of the team who shot Ms. Howard. Accepting this as true, plaintiff has adequately alleged his personal participation.

### d. Deputy Chief Butaud and Major Lanphear

Plaintiff alleges that Deputy Chief Butaud and Major Lanphear, as supervisors on the scene, entered the house and failed to intervene with the shooting. She also claims that they "participated in the siege by entering the house and assisting the officers and deputies." (Doc. 1, at 5 ¶ 20.) But plaintiff does not allege that these supervising defendants were near the laundry room, observed the use of lethal force, or had a realistic opportunity to intervene while in the house. Plaintiff alleges that after Sergeant Sweany broke down the laundry room door, thirteen seconds passed before the officers opened fire. Her allegations do not support an inference that Deputy Chief Butaud or Major Lanphear could have done anything to stop the shots during the thirteen seconds. Plaintiff's allegations against Deputy Chief Butaud and Major Lanphear are insufficient to allege personal participation.

### e. Chief Menke and Sheriff Hayden

Neither Chief Menke nor Sheriff Hayden was present at the time of the events. Chief Menke did arrive after the events had concluded. And at one point, Sheriff Hayden was consulted, as the complaint affirmatively alleges that Sheriff Hayden was "not on board" with the officers entering the house. (Doc. 1, at 4 ¶ 17, 5 ¶ 24.)

Plaintiff alleges that these two figures are responsible for the actions of their subordinates because they:

improperly and recklessly supervised their officers and deputies, resulting in the death of Ms. Howard. In fact, they recklessly and needlessly escalated the situation and failed to provide proper leadership and supervision consistent with the police department's policies and Sheriff's Office policies and nationally recognized law enforcement standards. Defendant Menke and Defendant Hayden failed to provide Defendants with adequate training and supervision, directly resulting in Ms. Howard's injuries and death.

(Doc. 1, at 9 ¶ 47.)

Chief Menke and Sheriff Hayden's supervisory positions alone are not sufficient to allege personal participation in their individual capacities. *Gallagher*, 587 F.3d at 1069. "[T]he defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation." *Fogarty*, 523 F.3d at 1162. Plaintiff has not adequately alleged direct personal responsibility for excessive force on the part of either of these two defendants. The court determines that the § 1983 claims against these defendants in their individual capacities should be dismissed.

### 2. Constitutional Violation

The above personal participation analysis leaves six remaining individual defendants: Sergeant Mellick, Sergeant Sweany, Officer Mills, Officer Miller, Deputy Denton, and Deputy Chaulk. At this stage of the proceedings, the court considers the actions inside the house of these parties jointly. Plaintiff has alleged that they entered the house together and all were present during the shooting. The complaint does not allege who the shooters were, but plaintiff has alleged that they all were present and in a position to intervene. The court will therefore consider qualified immunity collectively with respect to these defendants. *See Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2017) (observing that "when appropriate," courts consider qualified immunity in the aggregate, foregoing individualized qualified immunity analysis for each defendant).

To be liable under § 1983, a defendant must engage in a deliberate deprivation of constitutional rights—not a negligent deprivation. *Woodward v. Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992);

*Moore v. Bd. of Cty. Comm'rs*, 470 F. Supp. 2d 1237, 1246 (D. Kan. 2007). Officers are afforded some "breathing room" to make reasonable mistakes while making quick decisions in "tense, uncertain and rapidly evolving situations." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The constitution requires reasonable means—not the least intrusive means. *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009); *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004). And officers may take protective action without waiting for the "glint of steel." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). An officer would be justified in using more force than necessary if he reasonably (but mistakenly) believed that a subject was likely to fight back. *Id.*

In resolving an excessive force question in the context of qualified immunity on a motion to dismiss, courts consider and balance three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee." *Long*, 545 F. App'x at 760 (citing *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012), and *Graham*, 490 U.S. at 396). Moreover, a subject's mental illness or disturbed condition is relevant to the reasonableness determination. *Giannetti v. City of Stillwater*, 216 F. App'x 756, 764 (10th Cir. 2007); *Allen v. Muskogee, Okla.*, 119 F.3d 837, 840, 842 (10th Cir. 1997); *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699, 701, n.10 (10th Cir. 1995).

Applying these factors to the facts of the case, the pleaded facts indicate that the crime was not particularly severe. While Ms. Howard may have had a felony arrest warrant, the warrant was for walking away from a residential center while on probation. And whether Ms. Howard represented an immediate threat to the safety of the officers is debatable. Certainly, when they broke into the laundry room, Ms. Howard was waving a gun in the air. But she was waving it aimlessly, according to the complaint. And she only became a danger to the officers when they broke into the laundry room. Before that time, she was a threat only to herself. As for the third factor, Ms. Howard arguably was

actively resisting arrest, but she was not attempting to flee. To the contrary, her refusal to leave the house for hours led to the officers' breach of the house and laundry room.

Defendants claim that their actions were justified based on the four factors of *Estate of Larsen v. Murr*. In that case, the Tenth Circuit identified four non-exclusive factors for evaluating the threat facing officers:

> (1) Whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

*Estate of Larsen*, 511 F.3d at 1260. "[I]n the end, the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of circumstances justified the use of force." *Id.*

Applied in a vacuum to the thirteen seconds before Ms. Howard was shot, these factors weigh fairly evenly for and against finding the use of lethal force reasonable. Certainly, they create a question for the jury if the evidence ultimately supports the complaint's allegations. Defendants ordered Ms. Howard to drop her weapon and she did not. She did not make hostile motions, but was waving the gun aimlessly. The distance was short, but the stated intentions of the suspect were self-harm—not harm of the officers and deputies. But when the bigger picture of the circumstances immediately preceding the last thirteen seconds are considered, it becomes even more certain that there is a triable issue whether lethal force was reasonable. The officers and deputies themselves created the situation where there was a very short distance separating them from Ms. Howard. They were not subject to a threat of harm until after they entered the house and, ultimately, the laundry room.

Defendants, however, maintain that the court should look at the actions of the officers and deputies (and Ms. Howard) at the time of the shooting—and only at the time of the shooting. In support, defendants cite Tenth Circuit law stating that courts "scrutinize only the seizure itself, not events leading to the seizure, for reasonableness under the Fourth Amendment." *Bella v. Chamberlain*,

24 F.3d 1251, 1256 (10th Cir. 1993) (citation and internal quotations omitted). They claim that the proper focus is on whether the officers were in danger at the precise moment of the threat of force. *See Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001); *Bella*, 24 F.3d at 1256. Defendants argue that a recent Supreme Court case, *County of Los Angeles, California v. Mendez*, 137 S. Ct. 1539 (2017), precludes plaintiff's arguments that the officers and deputies "provoked an unnecessary and deadly confrontation." (Doc. 1, at 2 ¶ 1.) And finally, defendants argue that for the court to consider conduct undertaken before the suspect threatens force, such conduct must be "immediately connected" to the seizure and threat of force. *See Allen*, 119 F.3d at 840; *Hastings v. Barnes*, 252 F. App'x 197, 203 (10th Cir. 2007) (noting that only reckless and deliberate conduct that is "immediately connected to the seizure will be considered") (citing *Medina*, 252 F.3d at 1132). According to defendants, there were no actions in this case immediately connected to the seizure and threat of force. The entire series of discrete events was drawn out over the course of the afternoon.

In *Mendez*, the Supreme Court held, "All we hold today is that *once* a use of force is deemed reasonable under *Graham*, it may not be found unreasonable by reference to some separate constitutional violation." 137 S. Ct. at 1547 n*. The court did not decide the propriety of considering "unreasonable police conduct prior to the use of force that foreseeably created the need to use it." *Id.* For this reason, *Mendez* is distinguishable from the case before the court, as well as from two other Tenth Circuit cases that guide this court: *Allen* and *Sevier*. These cases remain the law of the circuit. *Pauly*, 874 F.3d at 1219 n.7 ("*Sevier* and *Allen* remain good law in this circuit."); *see also Ceballos ex rel. Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 n.2 (10th Cir. 2019) ("We recently affirmed this longstanding Tenth Circuit law, notwithstanding *County of Los Angeles v. Mendez*."); *Clark v. Colbert*, 895 F.3d 1258, 1264 (10th Cir. 2018) ("[P]olice officers can incur liability for 'reckless' conduct that begets a deadly confrontation.") (citing *Allen*, 119 F.3d at 841).

Both *Allen* and *Sevier* held that the court may, in appropriate circumstances, consider events leading up to the seizure to determine whether the use of force was reasonable. *See Allen*, 119 F.3d at 840 ("The excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force."); *Sevier*, 60 F.3d at 699 ("The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."); *see also Pauly*, 874 F.3d at 1219–20 ("Our precedent recognizes that '[t]he reasonableness of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force."'") (quoting *Jiron*, 392 F.3d at 415 (quoting *Sevier*, 60 F.3d at 699)); *Hasting v. Barnes*, 252 F. App'x 197, 203 (10th Cir. 2007) ("The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force but also on whether the officers' own conduct during the seizure unreasonably created the need to use such force."); *Medina*, 252 F.3d at 1132 ("An officer's conduct before the suspect threatens force is therefore relevant provided it is 'immediately connected' to the seizure and the threat of force."); *Bella*, 24 F.3d at 1256 n.7 ("Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure is reasonable.").

As the cases above demonstrate, the law in this circuit is that the court may consider events leading up to the seizure—at least if those events are immediately connected to the seizure and threat of force. While in this case, that conduct may not include every action of the officers over the course of the afternoon, plaintiff has at least alleged facts suggesting that the forced entry into the house and the laundry room are immediately connected. Considering the actions of the officers and deputies

during that time, the court determines that plaintiff has adequately alleged a constitutional violation with respect to the defendants who survived the personal participation inquiry.  In considering the totality of the circumstances, the court observes the following allegations in plaintiff's complaint: (1) while defendants remained outside the house, there was no immediate danger to them or to the public; (2) defendants were aware of Ms. Howard's mental instability; (3) defendants knew Ms. Howard had access to a gun; (4) defendants elected to forcibly enter both the house and the laundry room with a barking police dog, shouting commands and threats; and (5) Ms. Howard did not level her gun at the officers—instead waiving it aimlessly in the air after repeatedly threatening suicide.  Considering not only the moment the officers and deputies shot Ms. Howard, but also those immediately preceding the incident, plaintiff has stated a constitutional violation.

### 3. Clearly Established

The next step in the qualified immunity analysis is to decide whether the law was clearly established at the time of the constitutional violation (or alleged constitutional violation).  To show that a law is "clearly established," a plaintiff must identify pre-existing precedent that places the "constitutional question beyond debate."  *Yeasin v. Durham*, 719 F. App'x 844, 850 (10th Cir. 2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  A plaintiff must identify "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains."  *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (citation omitted).  The relevant precedent need not be directly on point, but the plaintiff "must do more than cite case law announcing a legal rule 'at a high level of generality.'"  *Yeasin*, 719 F. App'x at 850.  The precedent must be particularized to the facts of this case, *id.*, making it sufficiently clear such that every reasonable official would have known that the defendant's actions would violate the plaintiff's rights, *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  But the Tenth

Circuit has counseled that "[w]e cannot find qualified immunity wherever we have a new fact pattern." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). *Casey* applied a "sliding scale" concept to evaluating whether a right is clearly established—the more egregious the conduct, the less specificity is required from prior case law. This sliding scale test has been called into question recently, *see McCoy v. Meyers*, 887 F.3d 1034, 1053 n.22 (10th Cir. 2018), but the Tenth Circuit has not yet decided that it conflicts with Supreme Court authority. If force is clearly unjustified based on the *Graham* factors, then the court may conclude that a right is clearly established, even in the absence of similar prior cases. *Morris*, 672 F.3d at 1197–98.

Plaintiff identifies two Tenth Circuit cases that allegedly put defendants on notice that their conduct would violate a clearly established right: *Allen* and *Hastings*. The court examines the facts of those cases to determine whether plaintiff is correct.

### a. *Allen* (Man threatening suicide in car with gun)

Officers in *Allen* had been advised that Mr. Allen was armed, was involved in an altercation with his wife and children, had threatened family members, and had threatened suicide. 119 F.3d at 839. When they arrived on the scene, Mr. Allen was in a vehicle, sitting in the driver's seat with one foot out of the vehicle. *Id.* He held a gun on the console between the seats. *Id.*

Officers cleared the area of bystanders, and there was some testimony indicating that Lt. Smith ran screaming to Mr. Allen's car and shouting at Mr. Allen to get out of the car. *Id.* at 839, 841. Within the next ninety seconds, Lt. Smith repeatedly told Mr. Allen to drop his gun. *Id.* at 839. Another officer arrived at the car and held Mr. Allen's left arm while Lt. Smith tried to grab the gun. *Id.* A third officer tried to open the passenger door. *Id.* Mr. Allen pointed the gun at the third officer, then swung it to the two officers at the driver's door, and shots were exchanged. *Id.* Ultimately, Mr. Allen was killed. *Id.* The court held that "a reasonable jury could conclude on the basis of some of the

testimony presented that the officers' actions were reckless and precipitated the need to use deadly force." *Allen*, 119 F.3d at 841.

  b. *Hastings (Man in house, cornered with sword)*

*Hastings*, while an unpublished opinion, may still be used to decide whether the law is clearly established. *Ceballos*, 919 F.3d at 1217 n.3. In this case, Mr. Hastings called Family and Children Services, seeking counseling and expressing suicidal thoughts. *Hastings*, 252 F. App'x at 198. He planned to asphyxiate himself but gave permission to the call-taker to contact Community Outreach Psychiatric Emergency Services, which then called 911. *Id.* Officers were told that Mr. Hastings was contemplating suicide by asphyxiation, was non-violent, and not known to be armed. *Id.* at 199.

When police knocked on the door, they began talking with Mr. Hastings and asked him to step out on the porch to talk with them. *Id.* Mr. Hastings appeared nervous and evasive, and one officer believed that he was going to shut the door and retreat into the house. *Id.* He put his foot in the doorway, and, as suspected, Mr. Hastings slammed the door and ran into a bedroom. *Id.* Officers followed and one saw Mr. Hastings pick up a Samurai sword. *Id.* That officer drew his weapon and yelled "knife" to the other officers. *Id.* Four officers positioned themselves in the door, weapons drawn, within eight to ten feet away from Mr. Hastings. *Id.* at 199–200.

Mr. Hastings held the sword in a defensive manner, but did not comply when the officers told him to put it down. *Id.* at 200. At one point, Mr. Hastings turned it on himself, but then grabbed the telephone and said something into the receiver like "help me" or "they are coming to get me." *Id.* One officer pepper-sprayed Mr. Hastings, but it had no impact. *Id.* Mr. Hastings turned the sword toward the officers and began moving toward them. *Id.* The doorway was too crowded for retreat, so the officers shot Mr. Hastings, who died at the scene. *Id.* The incident lasted less than four minutes. *Id.*

In reviewing the record, the Tenth Circuit concluded not only that there was triable issue for the jury about whether the use of deadly force was reasonable, but also that the law was clearly established:

> *Allen* and *Sevier* provided Barnes and Davis the requisite fair warning that their conduct in this case was unlawful. They clearly establish that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (i.e., running and screaming at him). That is exactly what Barnes and Davis did in this case. Rather than attempt to talk to Todd and calm him, they cornered him in his bedroom, issued loud and forceful commands at him and pepper-sprayed him, thereby further upsetting Todd and precipitating the need to use deadly force.

*Id.* at 206.

### c.  Application to This Case

Both *Allen* and *Hastings* put the officers and deputies on notice that the shooting of Ms. Howard, under the circumstances they faced, would be a violation of her Fourth Amendment right to be free of unreasonable seizure. Taking the facts in the light most favorable to plaintiff, the officers and deputies who entered the house and laundry room recklessly escalated a confrontation with a mentally and emotionally distressed woman who was alone in a house threatening suicide. It was clearly established that their actions, as pleaded, were unconstitutional. The officers and deputies are not entitled to qualified immunity.

### E.  Official Capacity Claim Against Sheriff Hayden

Sheriff Hayden moves to dismiss the claims against him in his official capacity on the basis of Eleventh Amendment immunity. The Eleventh Amendment provides immunity to unconsenting states and those acting on their behalf from federal suits for money damages. U.S. Const. amend. XI; *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). It does not, however, extend immunity to counties, municipalities, or other local government entities. *Steadfast Ins. Co. v. Agric. In. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) (citation omitted). In determining whether a particular entity receives Eleventh

Amendment immunity, the court considers whether the entity is an "arm of the state." *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977).

The Tenth Circuit and a number of judges in the District of Kansas have held that Kansas sheriffs act on behalf of the state and are therefore immune from suit in federal court. *See Hunter v. Young*, 238 F. App'x 336, 338 (10th Cir. 2007); *Kellogg v. Coleman*, No. 18-1061-JTM, 2019 WL 2207954, at *11 (D. Kan. May 22, 2019); *Broyles v. Marks*, No. 18-3030-SAC, 2018 WL 2321822, at *4 (D. Kan. May 22, 2018); *Self v. Cty. of Greenwood*, No. 12-1317-JTM, 2013 WL 615652, at *2 (D. Kan. Feb. 19, 2013); *Brown v. Kochanowski*, No. 07-3062-SAC, 2012 WL 4127959, at *9 n.3 (D. Kan. Sept. 19, 2012), *aff'd* 513 F. App'x 715 (10th Cir. 2013). The undersigned judge recently found the same in *Myers v. Brewer*, No. 17-2682, 2018 WL 3145401, at *6 (D. Kan. June 27, 2018). But other District of Kansas judges have found that sheriffs are not entitled to immunity in Kansas. *See, e.g., Manley v. Bellendir*, No. 18-1220-EFM, 2019 WL 3430563, at *4 (D. Kan. July 30, 2019); *Estate of Holmes v. Somers*, No. 18-1221-JWB, 2019 WL 1670796, at *17 (D. Kan. Apr. 17, 2019); *Trujillo v. City of Newton*, No. 12-2380-JAR, 2013 WL 535747, at *10 (D. Kan. Feb. 12, 2013); *Reyes v. Bd. of Cty. Comm'rs of Sedgwick Cty.*, No. 07-2193-KHV, 2008 WL 2704160, at *7–9 (D. Kan. July 3, 2008).

At this time, the court sees no reason to depart from its recent analysis in *Myers*. Despite the growing disagreement in Kansas about whether sheriffs are arms of the state when acting in a law enforcement capacity, this court stands by its analysis in *Myers* and incorporates it here by reference. Sheriff Hayden is entitled to Eleventh Amendment immunity for the claims against him in his official capacity. The claims against him in his official capacity—including state law claims—are dismissed without prejudice. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984)

("[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment.").

### F. *Monell and Official Capacity Claim Against Chief Menke*

Defendants move to dismiss the *Monell* claims against Johnson County, the Board of Commissioners of Johnson County, and the City of Olathe. They also move to dismiss the official capacity claim against Chief Menke as duplicative of the claim against the City of Olathe. In these claims (contained in Count II of the Complaint), plaintiff seeks to hold these county and municipal parties liable for the actions of their employees because they have policies, customs, and practices of failing to properly train and supervise their deputies and officers. (Doc. 1, at 9–10 ¶ 52.) Plaintiff also claims that they have inadequate policies on the use of deadly force, practices or customs of inadequate investigations, and practices or customs of not following policies and insubordination. (*Id.*) Defendants ask for dismissal, arguing that (1) the official capacity claim against Chief Menke is duplicative of the claim against the City of Olathe; (2) Johnson County is not a proper defendant; (3) the Board of County Commissioners is not responsible for the policies, customs, and practices of the Sheriff's Office; and (4) municipal liability against the City of Olathe is not warranted based on the conclusory allegations of the complaint. The court addressed each of these arguments in turn.

First: Chief Menke in his official capacity. Defendants argue that the claims against Chief Menke in his official capacity are duplicative of the claims against the City of Olathe and should be dismissed. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. The court agrees and dismisses the official capacity claims against Chief Menke.

Second: Johnson County. Kan. Stat. Ann. § 19-105 provides in relevant part, "In all suits proceeding by or against a county, the name in which the county shall sue or be sued shall be 'The board of the county commissioner of the county of _____'." This statute indicates that the county is named by suing the Board of County Commissioners—which plaintiff has done. The court therefore dismisses Johnson County as an improper and duplicative party. *Barngrover v. Cty. of Shawnee*, No. 02-4021-JAR, 2002 WL 1758914, at *1 (D. Kan. June 10, 2002).

Third: The Board of County Commissioners. In theory, the Board would be the proper party to sue for the policies of the Sheriff's Department. But plaintiff has alleged that Sheriff Hayden, in his official capacity, is responsible for the policies of his department. (Doc. 1, at 9 ¶ 49.) Plaintiff claims that those policies, along with established practices and customs, resulted in the deprivation of Ms. Howard's constitutional rights. Plaintiff does not allege that the Board participated in any alleged violations of Ms. Howard's rights.

Under Kansas law, it is the Sheriff—not the Board of County Commissioners—who is responsible for serving and executing arrest warrants and keeping the peace. *See* Kan. Stat. Ann. §§ 19-812 and 19-813. And the Board of County Commissioners does not oversee the Sheriff's acts. *See Lee v. Wyandotte Cty.*, 586 F. Supp. 236, 238–39 (D. Kan. 1984); *Bd. of Cty. Comm'rs of Lincoln v. Nielander*, 62 P.3d 247, 251 (Kan. 2003) ("The sheriff is not a subordinate of the board of county commissioners . . . . Rather, the sheriff is a state officer whose duties, powers, and obligations derive directly from the legislature and are coextensive with the county board."). Plaintiff has not separately stated valid claims against the Board of County Commissioners, and the court dismisses the claims against them.

Fourth: The City of Olathe. Defendants claim that plaintiff fails to state a *Monell* claim against the City of Olathe because his allegations are conclusory and boilerplate, and fail to reference any well-pleaded facts that would make the claims plausible.

In *Monell*, the United States Supreme Court held that a municipality can be liable under § 1983 for violations of civil rights if the violation is the result of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. This "official policy" requirement distinguishes the act of the municipality from acts of the employees of the municipality, as municipality liability cannot derive from a theory of respondeat superior. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986). A government, therefore, cannot be sued under § 1983 for injuries caused by its employees; rather, liability only attaches "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict the injury." *Monell*, 436 U.S. at 694; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (holding that *Monell* liability attaches only "for acts for which the municipality itself is actually responsible, 'that is, acts which the municipality has officially sanctioned or ordered.'"). Only municipal officials who have "final policymaking authority" are subject to *Monell* liability, and the challenged action "must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy . . . ." *Id.*

To establish liability under *Monell*, a plaintiff must show "(1) the existence of a municipal custom or policy and (2) a direct casual link between the custom or policy and the violation alleged." *Hollingsworth v. Hill*, 110 F.3d 733, 742 (1997). Municipal liability can be based on (1) a formal regulation or policy statement, (2) an informal custom that amounts to a "widespread practice that, although not authorized or written by law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law,'" (3) the decisions of employees with final policymaking authority, or (4) "the ratification by such final policymakers of the decision—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir.

2010) (citing *Praprotnik*, 485 U.S. at 123–27; *Monell*, 436 U.S. at 690–91; *Pembaur*, 475 U.S. at 480–81).

Additionally, the Supreme Court has held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989) (rejecting the contention that only unconstitutional policies are actionable under § 1983). Municipal liability may be based on a failure to train or failure to supervise employees, but only if that failure results from "deliberate indifference" to the injuries that may be caused. *Brammer-Hoelter*, 602 F.3d at 1189. There is a four-part test for evaluating whether a municipality may be liable based on inadequate police training in the use of force:

> (1) the officers exceeded their constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute an usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward person with who the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen*, 119 F.3d at 841–42.

Here, plaintiff makes a number of allegations against the City of Olathe (and others) under *Monell*. These allegations (along with a few other paragraphs surrounding them) track the required elements for *Monell* claims. They do not contain as many facts as are contained elsewhere in the complaint. But plaintiff has not yet been granted discovery into the policies, practices, and customs that may have resulted in the officers' actions. As this point in the litigation, the court determines that plaintiff has alleged a plausible *Monell* claim against the City of Olathe. The facts of the case may not eventually support that claim, but the allegations at this point are sufficient to allow the claim to proceed.

### G. State Law Claims

1. <u>Assault and Battery – Against Defendants Sweany, Mellick, Mills, Denton, Miller, and Chaulk</u>

Defendants initially made three arguments for dismissal of the assault and battery claims: that plaintiff lacks standing; that the claims are barred by the statute of limitations; and that defendants' actions were privileged under Kan. Stat. Ann. § 21-5227(a). After the court's prior rulings in this order and a concession by defendants that the claims are not untimely, only the privilege issue under § 21-5227(a) remains for disposition.

Kan. Stat. Ann. § 21-5227(a) provides:

> Such officer is justified in the use of any force which such officer reasonably believes to be necessary to effect the arrest and the use of any force which such officer reasonably believes to be necessary to defend the officer's self or another from bodily harm while making the arrest. However, such officer is justified in using deadly force only when such officer reasonably believes that such force is necessary to prevent death or great bodily harm to such officer or another person, . . . .

This statutory provision does not provide any protection from liability for a law enforcement officer's unreasonable use of force. And as discussed above, plaintiff has plausibly alleged facts suggesting that defendants acted unreasonably. Section 21-5227(a) does not protect defendants, and the court denies their motions to dismiss on this issue.

2. <u>Survival Claim – Against All Defendants</u>

As for the survival claim, defendants again raise standing, as well as an argument that the claim was not included in plaintiff's Notice of Claim. Because the court has already addressed standing, the only question remaining is the sufficiency of the Notice of Claim.

Kansas requires plaintiffs to file proper notice under Kan. Stat. Ann. § 12-105b(d) before filing suit against a municipality. *Gessner v. Phillips Cnty. Com'rs*, 11 P.3d 1131, 1134 (Kan. 2000); *Talavera v. Sw. Med. Ctr.*, No. 09-2572-JWL, 2010 WL 3001723, at *1 (D. Kan. July 28, 2010). Notice of claims under the Kansas statute is a jurisdictional prerequisite to bringing suit against a

municipality. *Christopher v. State ex rel. Kan. Juvenile Justice Auth.*, 143 P.3d 685, 691 (Kan. Ct. App. 2006). But the jurisdictional bar applies only to lawsuits against municipalities. Failure to comply with the statute does not deprive a court of jurisdiction over a case against a municipal employee. *Whaley v. Sharp*, 343 P.3d 63, 69 (Kan. 2014) (overruling *King v. Pimentel*, 890 P.2d 1217 (Kan. App. 1995)). Moreover, substantial compliance is allowed. Kan. Stat. Ann. § 12-105b(d). "Substantial compliance" means "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." *Orr v. Heiman*, 12 P.3d 387, 389 (Kan. 2000) (internal quotation marks omitted. The purposes of the notice requirement are to "sufficiently advise the proper municipality . . . of the time and place of the injury and give the municipality an opportunity to ascertain the character and extent of the injury sustained." *Bell v. Kan. City, Kan., Housing Auth.*, 992 P.2d 1233, 1235 (Kan. 1999) (citations omitted). The statute requires that the Notice contain the following five elements:

> (1) The name and address of the claimant and the name and address of the claimant's attorney, if any; (2) a concise statement of the factual basis of the claim, including the date, time, place and circumstances of the act, omission or event complained of; (3) the name and address of any public officer or employee involved, if known; (4) a concise statement of the nature and the extent of the injury claimed to have been suffered; and (5) a statement of the amount of monetary damages that is being requested.

Kan. Stat. Ann. § 12-105b(d). Defendants claim that plaintiff's Notice fails to mention a survival claim, fails to identity the correct name and address of the claimant, and underrepresents the amount of damages sought.

Upon reviewing the Notice (which the court takes judicial notice of, although it is not attached to the complaint), the court determines that it substantially complies with the statutory requirements. The statute requires a factual basis for the claim—which is included for a survival claim, although the term "survival claim" is not mentioned specifically. Although the Notice does not specifically identify Mark Arnold as the Special Administrator or his address, it does list Ms. Howard and her heirs and list

the attorney's address. *See Sleeth v. Sedan City Hosp.*, 317 P.3d 782, 791 (Kan. 2014) (agreeing that the the plaintiffs' failure to add their personal addresses to the notice of claim was "inconsequential" and would have "added nothing because counsel's contact information was included."). And the Notice of Claim seeks damages in excess of $1,000,000. In this case, plaintiff seeks excess of $1,000,000 (specifically, $4,000,000). These claims are consistent. In *Continental Western Ins. Co. v. Schultz*, the Kansas Supreme Court held that a Notice of Claim was not deficient when the eventual damages sought in court were eleven times the amount listed in the Notice of Claim. 304 P.3d 1239, 1244 (Kan. 2013). As in *Schultz*, plaintiff's damages calculation in the Notice of Claim was sufficient to allow the parties to begin a "full investigation and understanding of the merits of the claims advanced." *Id.* at 1244.

None of defendants' arguments about the Notice of Claim merit dismissal. Plaintiff adequately met the requirements of Kan. Stat. Ann. 12-105b(d).

### 3. Wrongful Death Claim – Against All Defendants

With respect to the wrongful death claim, defendants argue that it must be brought by the heir-at-law (which, again, the court has already addressed). Defendants also raise privilege under § 21-5227(a) again, as well as immunity under the Kansas Tort Claims Act ("KTCA"). For the same reason identified above, § 21-5227(a) does not help defendants. And the same logic applies to the invocation of the discretionary function exception found in Kan. Stat. Ann. § 65-6104(e). *See Hopkins v. State*, 702 P.2d 311, 319 (Kan. 1985) ("A law enforcement officer is obligated to use reasonable and ordinary care and diligence in the exercise of his duties, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other law enforcement officers in the same or similar locations. A law enforcement officer who acts maliciously or wantonly fails to exercise the reasonable and ordinary care and diligence required of a law enforcement officer

and acts outside the protection afforded by the act."); *see also Dauffenbach v. City of Wichita*, 667 P.2d 380, 386 (Kan. 1983) ("The officer may not, however, use an unreasonable amount of force or wantonly or maliciously injure a suspect.").  Based on the well-pleaded allegations in the complaint, the court denies defendants' motion on this claim.  The facts "could support a reasonable inference of willful and wanton disregard of [Ms. Howard's] rights and safety."  *Ceballos*, 919 F.3d at 1223.

**IT IS THEREFORE ORDERED** that defendants' motions to dismiss (Docs. 37 and 47) are granted in part and denied in part.  The following claims are dismissed, but all other claims may proceed at this time:

- Any independent Fourteenth Amendment due process claim;

- The § 1983 individual capacity claims against defendants Sparks, Wessling, Mellick, Butaud, Lanphear, Menke, and Hayden;

- The § 1983 official capacity claims against defendant Menke;

- All claims against defendant Hayden in his official capacity;

- All claims against defendant Johnson County and the Johnson County Board of Commissioners.  These two parties are dismissed from the case.

Dated this <u>10th</u> day of September, 2019, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**
