## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MARK ARNOLD,**

   **Plaintiff,**

   **v.**                                        **Case No. 2:18-cv-02703-HLT**

**OLATHE, KANSAS, CITY OF, et al.,**

   **Defendants.**

## MEMORANDUM AND ORDER

This case centers on the tragic shooting death of Ciara Howard. Plaintiff Mark Arnold is the administrator of her estate and brings this civil-rights action against several law-enforcement officers and entities arising out of Howard's 2017 shooting death. Defendants are various law-enforcement officers or officials in the Olathe Police Department ("Olathe PD") or the Johnson County Sheriff's Office ("JCSO"). All Defendants move for summary judgment. Docs. 256 and 260. Plaintiff also moves to exclude expert testimony. Docs. 252 and 254.

For the reasons outlined below, the Court finds that the individual officers directly involved in the shooting are entitled to qualified immunity because Plaintiff has not demonstrated that the officers unreasonably used deadly force or that the officers' conduct violated a clearly established constitutional right. Because there was no constitutional violation by the officers, the supervisory and *Monell* claims based on that same conduct also fail. Likewise, the officers are entitled to summary judgment on Plaintiff's state-law claim for assault and battery because their conduct was reasonable and thus privileged under state law. Finally, Plaintiff has not opposed Defendants' argument that Plaintiff is not the proper party to assert a wrongful-death claim. Accordingly, the Court enters summary judgment in favor of Defendants on all claims. Plaintiff's motions to exclude expert testimony are therefore denied as moot.

## I.      BACKGROUND[1]

### A.      Relevant Parties

Plaintiff is special administrator of Howard's estate. Plaintiff is Howard's stepfather and is not Howard's heir. Howard is survived by four minor children.

Defendants are various law-enforcement officers and officials in either the Olathe PD or the JCSO. The Olathe Defendants are Major Wade Lanphear, Sergeant Tim Sweany, Officer Ian Mills, Officer Jameson Miller, Police Chief Steven Menke, and the City of Olathe, Kansas. At all relevant times, the City of Olathe employed the individual Olathe Defendants. The Johnson County Defendants are Sheriff Calvin Hayden, Sergeant Theron Chaulk, and Deputy Clinton Peterson, who at all relevant times were employed by the JCSO.[2]

### B.      Initial Dispatch to Residence – August 23, 2017, at 2:48 p.m.

On August 21-22, 2017, the Johnson County District Court issued bench warrants for Howard. The underlying charges were felony supervision violations and aggravated escape from custody. On August 23, 2017, an individual identifying herself as Larry Sumners's sister called the JCSO and stated that Howard was hiding at a house at 112 S. Keeler Street. Sumners reportedly did not want Howard there with his children. Sumners was Howard's boyfriend and was the sole owner of the residence on Keeler Street.

Miller and two other Olathe PD officers responded to the call and arrived at the house at 2:48 p.m. Dispatch confirmed that Howard had felony warrants, and the officers responded to the residence for possible service of the arrest warrants. Eventually, several other Olathe PD and JCSO

---

[1]   For purposes of summary judgment, the Court sets forth only those uncontroverted facts required to reach its decision. To the extent necessary, the Court discusses additional or disputed facts in analyzing the arguments.

[2]   Several other officers were present at different stages of the incident. To simply things, the Court has attempted to refer by name only to the officers who are parties to this case.

officers arrived at the house. Because Olathe PD officers arrived first, Olathe PD was primarily in charge of the scene.

Sumners told the officers that he was the owner of the house and that Howard had been his girlfriend, but she left after they got into a fight. Sumners initially denied that Howard was in the house and refused entry to the officers. But he later admitted she was there and gave officers verbal and written consent to search the house for Howard.[3] He also told an officer that he kept a .45 caliber pistol with hollow point bullets in the house under a mattress. But he had hidden it in a closet and not told Howard where it was hidden. Shortly after officers arrived on the scene, an officer at the back of the house reported seeing a female trying to crawl under a mattress.

Miller subsequently called Sweany, who was his supervisor, to the scene. When Sweany arrived, Miller told him there was an unknown female inside who was possibly armed, and another officer reported that Sumners had indicated there was a gun in the house. Sumners also told an officer on scene that Howard was bipolar. But there is no evidence that any Defendant was aware of this information. When Sumners told the officer, Sweany was nearby. But Sweany testified he was not aware that Howard was bipolar before he entered the house.

### C. Negotiations Outside the House – 2:48 p.m. to 5:34 p.m.

Between 2:48 p.m. and 5:34 p.m., officers tried to convince Howard to come out of the house, but she repeatedly refused. During this time, Lanphear arrived on scene. Lanphear is a trained crisis negotiator. On his arrival, Lanphear became the officer in charge of the scene, though he didn't take over for Sweany in his role as supervisor. Lanphear came to the house because he was getting conflicting information about the situation and wanted to decide whether the tactical

---

[3]   Officers did not enter the house to search for Howard until 5:40 p.m. It is unclear when Sumners consented to the search, but no one disputes that officers had Sumners's consent at the time they entered the house.

unit should be activated. Sumners told Lanphear there was a loaded gun in the house, and Sweany relayed that it was normally kept under the mattress but had been moved to a closet. If Howard had been confirmed to have a gun, the officers would have discussed activating Olathe PD's tactical unit. But Lanphear would not make that recommendation based only on a likelihood that Howard had a gun.

During this time period, Sweany asked Sumners if Sumners could convince Howard to leave the house. Peterson and Chaulk were not involved in these negotiations. Chaulk never communicated directly or indirectly with Howard. Sumners subsequently told Howard that "the SWAT team is coming and they're trigger happy." Sumners also said to Howard, "What if they shoot you and you don't die and you're a paraplegic. You want to be a fuckin' vegetable?" Another officer stated that Howard was threatening suicide. Howard made comments about suicide while talking to Sumners, and Howard expressed that she was ready to die and was not afraid to die. Sweany, Lanphear, Miller, Mills, and Peterson either heard Howard make comments about suicide or else assumed she was suicidal to some degree. Sumners also told Sweany that, a few days before, Howard had made scratches on her wrist while threatening suicide, though the scratches did not require a Band-Aid. Sumners was encouraged to keep talking to Howard. Sweany also testified at his deposition that he believed Howard was under the influence of methamphetamine based on her behavior, his observations of her through the window, and comments made by other officers at the scene.[4]

---

[4] Plaintiff acknowledges that Sweany testified at his deposition that he believed Howard posed an imminent threat of serious injury or death because she was under the influence of methamphetamines, but Plaintiff controverts this statement of fact because Sweany did not state this before his deposition. But attacks based on credibility alone do not create a genuine issue of fact. *Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 742 (10th Cir. 2004) ("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion.").

Lanphear also discussed sending in a K-9. Lanphear and Sweany then discussed grabbing a shield, putting together a team, and going in the front of the house with a K-9. But Lanphear did not give Sweany an order or direction about whether he should enter the house. At the time, Lanphear believed Howard was talking in circles about not wanting to go to jail and "the mindset was to try to change the framework that she was looking at to see if that would elicit her to surrender."

Lanphear also heard Sweany talking to Howard about unloading the gun, which is a tactic used to try to confirm whether a gun is actually present. During that conversation between Sweany and Howard, Howard referred to the gun as "her power." Howard also stated she was trying to unload the gun. At one point, an officer told Sweany, "Watch yourself, I think that was the firearm," and that Howard "had it in front of the window before she closed it." That officer believed he had visually confirmed that Howard had a gun, and he pulled Sweany behind a tree for cover as a result. Sweany responded, "No, no, thank you," but it is disputed whether Sweany heard the comment about the gun. Lanphear testified he did not hear the comment. But Sweany later testified he assumed the potential existed that Howard had access to and the ability to use the gun. Miller was also under the impression that Howard had the gun, and Mills believed it was possible Howard had access to the gun.

While Olathe PD officers and Sumners were communicating with Howard, other officers, including Peterson and Chaulk, gathered nearby and discussed hypothetical tactics. Peterson indicated a tactical team would pump gas into the residence if deployed. Peterson and Chaulk also learned during this time that Howard had made suicidal comments.

At 5:27 p.m., Howard told Sumners she needed five minutes to think and have a cigarette. Sweany told her in response, "You've got five minutes Ciara." Shortly after that, Sweany requested

a shield and advised he was going to take a team and a K-9 to the front porch. Sweany told Chaulk that a team was going in the house and requested that a JCSO officer assist. Chaulk then asked Peterson whether he was willing to assist, and Peterson agreed.

### D.     Officers Gather at Front Door – 5:34 p.m. to 5:40 p.m.

At 5:34 p.m., Sweany, Miller, Mills, and Peterson[5] formed a line at the front of the house. Mills had a K-9 with him. The officers discussed the layout of the house, including the location of the bedrooms and the laundry room, where Howard was located. The house was a small, ranch-style, single-family house with three bedrooms, a living room, laundry room, and bathroom. The laundry room was 6'11" by 10'2".

Sweany told the team, "We are going to go to the front door and then start making commands. Let your dog start [inaudible]. Then try to get her to come out the back." Sweany testified that entering a house with a barricaded individual is generally not amenable to a specific step-by-step plan because the situation changes based on the circumstances at the time. Regarding the situation with Howard, Sweany testified there was "no solidified plan, no, because it was all based on a fluid situation. What we did would depend on what she did and totality of circumstances. Again it was a fluid situation."

From 5:34 p.m. to 5:40 p.m., Sweany told Howard multiple times to go out the back door and warned her that they would send in the K-9 if she did not leave. Howard continued talking with officers and Sumners at the back of the residence. While they were at the front door, Mills had his K-9 bark several times. The officers also discussed the layout of the house. At 5:37 p.m., Sweany noted Howard's position in the laundry room relative to the rest of the house.

---

[5]   It appears other officers who are not named as defendants were also part of this group.

### E.    Entry Into House – 5:40 p.m. to 5:56 p.m.

At 5:40 p.m., another officer announced over the radio that Howard's hands were empty. After this announcement, Sweany, Miller, Mills (with his K-9), and Peterson entered the house. At this point, two hours and fifty-two minutes had elapsed from when officers initially arrived at the house. At the time they entered, Sweany intended to get Howard to open the door to the laundry room and then they would release the K-9 if needed.

Lanphear was at the back of the house and was surprised to hear that the officers had entered the house. After the front of the residence was cleared, the officers gathered in the kitchen. Lanphear then entered the house and evaluated Howard's tone as she was speaking with Sweany. Lanphear was prepared to order the team out of the house if needed. But he didn't perceive that the officers' entry into the house had evoked an emotional response from Howard, who was mostly asking questions about going to jail. At the time, Howard had shut herself in the laundry room.

While they were in the house, the officers (primarily Sweany) continued talking with Howard and told her she needed to come out or else they would send in the K-9. After an officer confirmed over the radio that Howard's hands were empty, Sweany told Howard to go out back. At 5:42 p.m., an officer again announced over the radio, "Her hands are empty. Her hands are in the air. She's got her face to the window." The officers started toward the laundry room at that point, but after another officer announced over the radio that Howard had closed the window, the entry team moved back into the kitchen. At 5:49 p.m., while the officers were still in the kitchen, Miller, Mills, and Peterson discussed what would happen if Howard exited and "proned." If that occurred, Mills would pull back the K-9, and Peterson would go "hands-on" with Howard.

Sweany resumed talking with Howard, who was still inside the laundry room. Until approximately 5:56 p.m., Sweany attempted to convince Howard to come out of the laundry room.

They discussed her going to jail and whether she could get a bond and return to the house. Sweany repeatedly asked her to come out with her hands up and cautioned that they may have to release the K-9 if she didn't cooperate. Mills prepared his K-9. Peterson told officers outside to move away from the window to avoid any crossfire.

At one point, Howard opened the door to the laundry room 4 to 6 inches. When Howard opened the door, Miller could see her face and hair, as well as her hands, which appeared to be empty. Sweany continued talking to Howard, asking her to come out and discussing what would happen if she did. Howard began making kissing noises at the K-9, saying "Come on puppy, you wanna play with me? Aww, he likes me." When the dog barked, Howard began making barking noises.

### F.      Confrontation in Laundry Room – 5:56 p.m.

As the officers were talking to Howard, Sweany observed that Howard started becoming aggressive. He saw her make eye contact with the officers like she was taking inventory. He then saw her look back into the laundry room as if to orient herself to the things in that room. Sweany later testified, "that's when I realized in my mind that [Howard] was going to do something that we needed to intercept and retreat was not an option based on the number of people behind me. If [Howard] started firing through the wall there is no way that we could have gotten out of that house effectively without an officer getting hurt."

Howard then said, "I'm just gonna call the god dam police, fuck it," and slammed the laundry-room door. Sweany immediately forced the door open with his shoulder and entered the room, followed by Peterson and Miller. Upon entry, Sweany yelled, "Stop! Gun!" When the other officers entered the room, Mills determined the threshold was too congested to deploy the K-9, so

he worked to keep the K-9 under control. Mills could not see Howard at that point. When he heard Sweany yell "Gun," Mills focused on controlling the K-9 and getting the K-9 out of the house.

After officers broke through the laundry-room door, Howard waved a loaded .45 caliber handgun. As she was waiving it, the gun pointed in the general direction of the officers. Sweany, Miller, and Peterson drew their guns and repeatedly yelled at Howard to drop the gun. She refused. Howard then pointed the gun toward the officers with her finger on the trigger and said, "You ain't cops." Sweany, Miller, and Peterson continued yelling at her to drop the gun. Howard responded, "I'll take every single one of you." Immediately after that statement—approximately 13 seconds after they entered the laundry room and saw the gun—Sweany, Peterson, and Miller[6] fired their guns at Howard in self-defense. Howard died as a result of gunshot wounds.

Neither Lanphear nor Mills fired their handguns. Chaulk never entered the house and was outside the entire time the officers were inside the house and did not observe the shooting. It is unclear whether Menke or Hayden were ever on the scene, at least before the shooting.

### G.   Mental Health, Emergency, and Tactical Response Capabilities

Olathe PD participates in the Johnson County Mental Health Department's co-responder program. This gives Olathe PD access to mental-health professionals when responding to incidents involving mental-health issues. The JCSO did not have a co-responder program set up as of August 23, 2017, but JCSO could still contact Johnson County Mental Health.

The JCSO has a Sheriff's Emergency Response Team ("SERT"). Peterson was a member of SERT but was not acting in that capacity during the incident with Howard. The decision to

---

[6]   Olathe Defendant's memorandum states that Sweany, Peterson, and <u>Mills</u> fired their guns. Doc. 257 at 15. But the support for this statement of fact is Stipulated Fact 36 in the Pretrial Order, which states that Sweany, Peterson, and <u>Miller</u> fired their guns. *See* Doc. 243 at 7. Given this stipulation and other facts indicating that Mills did <u>not</u> fire his gun, Doc. 257 at 15; Doc. 243 at 7 (Stipulated Fact 37), along with facts indicating that Mills was trying to control the K-9 at the time of the shooting, the statement in the memorandum that Mills fired his gun appears to be a typo.

activate SERT is with the SERT Commander or the sheriff. Chaulk spoke with a captain about the situation, who then conferred with the SERT commander. The SERT commander did not believe the situation qualified for deployment of the SERT. Sheriff Hayden was consulted and agreed the situation did not qualify. The captain relayed this back to Chaulk and advised that the SERT would not respond because Howard's warrants were for non-violent felonies and the officers could not confirm Howard was in possession of a gun. SERT was never deployed in this incident.

Olathe PD has a Tactical Support Unit ("TSU") that can be mobilized at the direction of the chief of police or under certain circumstances, including when there is an armed or barricaded subject. Sweany, Miller, and Mills were not members of the TSU and did not have authority to mobilize it. The TSU is activated when an on-scene supervisor calls the TSU Commander, who then contacts the Major to discuss activating the TSU. The request is eventually made to the deputy chief and police chief for final approval. At the time of this incident, the Major was Lanphear.

On August 23, Sweany called the TSU Commander and reported that Howard had felony warrants and was barricaded in a back bedroom. The TSU Commander told Sweany to continue working the call for a while and then call back. Sweany called back a second time and the TSU Commander said that he didn't think the situation warranted activating the TSU and that Sweany should continue handling it. The situation with Howard did not meet the criteria for TSU activation because there was no confirmation that a gun was involved. Sweany was surprised and disappointed the TSU was not activated.

### H.   Plaintiff's Use-of-Force Expert

Plaintiff identified Jeffrey Noble as his use-of-force expert. Noble described the scene in the laundry room as shown by Peterson's body camera as follows:

> Bodycam video shows Ms. Howard's right side and a black firearm in her right hand, held at chest height with the muzzle facing

> officers. Once Deputy Peterson enters the laundry room, this allows Officer Miller to enter the room as well. Ms. Howard's left hand is on top of the gun near the slide and a faint metallic click is heard, as though she has racked the slide. Ms. Howard then moves the gun to her left hand and begins gesturing with her right hand, pointing and waving the gun at officers. When Ms. Howard switches hands the gun is pointed down at the floor briefly, then brought back up to shoulder height with the muzzle facing officers. As Ms. Howard is gesturing, she is heard yelling "you ain't cops." Ms. Howard also said, "I'll take every single one of you."

Noble's opinion is "that at the moment the officers used deadly force, there was an immediate threat of death or serious bodily injury to the officers and . . . deadly force was objectively reasonable and consistent with generally accepted police practices."

But Noble is critical of officers allowing Sumners to continue negotiating with Howard after Sumners made unhelpful comments and is specifically critical of Sweany imposing a five-minute deadline when he was outside of the residence and then terminating the negotiations in favor of other tactics likely to escalate the situation. However, Noble agrees that Sweany, Miller, and Mills were not involved in the decision to not activate the TSU and did not have the authority to activate it themselves, nor does he contend that they failed to provide relevant information to those who could decide to activate the TSU. Noble does not expect that officers would have to continue negotiating with a barricaded suspect indefinitely, and that there is no set amount of time that officers should try to negotiate before trying other tactics based on a totality of the circumstances.

Noble is critical of the officers for directing the K-9 to bark when it was in the front of the house as doing so tends to escalate the situation, and he is also critical of the officers for entering the house without a plan to safely apprehend Howard. Noble believes officers would normally have Sumners draw a diagram of the house. But he wasn't aware that Sumners had been asked to

draw a diagram of the house in this case. Body camera footage also shows the officers discussing the layout of the house prior to entry.

## II.      STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.     ANALYSIS

All Defendants move for summary judgment on all claims. Plaintiff has filed two *Daubert* motions regarding two different defense experts. The Court first considers the summary-judgment motions and evaluates the arguments on each count.

### A.      Counts 1 and 2 - § 1983 Excessive Force Claims Against Sweany, Miller, Mills, and Peterson

In Counts 1 and 2, Plaintiff alleges that Sweany (Count 1) and Miller, Mills, and Peterson (Count 2) violated the Fourth Amendment's prohibition against excessive force. Specifically, Plaintiff alleges Sweany, Miller, Mills, and Peterson are liable in their individual capacities for using excessive force or for recklessly creating the need to use deadly force. Doc. 243 at 18-19.

Defendants contend that the officers[7] used objectively reasonable force under the circumstances and are entitled to qualified immunity under both prongs of that analysis. *Id.* at 19-20.

Qualified immunity shields public officials from liability unless their conduct violates clearly established statutory or constitutional rights that a reasonable person would have known about. *Bond v. City of Tahlequah, Okla.*, 981 F.3d 808, 815 (10th Cir. 2020). "A defendant's assertion of qualified immunity from suit under 42 U.S.C. § 1983 results in a presumption of immunity." *Id.* The burden then shifts to the plaintiff. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). To overcome the presumption, a plaintiff must show that "(1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Bond*, 981 F.3d at 815 (quoting *Reavis ex rel. Estate of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020)). If the plaintiff cannot satisfy both prongs, the defendant is entitled to qualified immunity. *Olsen*, 312 F.3d at 1312.

At the summary-judgment stage, the Court considers the facts in a light most favorable to the plaintiff when evaluating the first prong. *Id.* If a plaintiff can demonstrate a constitutional violation and that the constitutional right was clearly established, the burden shifts back to the defendant to prove there is no genuine issue of material fact. *Id.*

---

[7]   For simplicity, reference to "the officers" in this analysis collectively refers to Sweany, Miller, Mills, and Peterson, except where distinctions are needed. The remaining defendants will be addressed separately. The Court also acknowledges that there are no allegations that Mills ever used deadly force or fired his gun. Olathe Defendants raise additional separate defenses for Mills in light of this. Courts are permitted to consider officer conduct individually or in the aggregate. *Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2017). In light of the conclusion that the use of force was not unreasonable, the Court does not separately analyze Mills's conduct, including whether he may have additional defenses to an excessive-force claim in light of the fact that he did not shoot.

### 1.    Qualified Immunity – Constitutional Violation

The Court first considers whether Plaintiff can demonstrate a constitutional violation. Plaintiff alleges the officers used excessive force when they shot and killed Howard. An allegation of excessive force that occurs before arrest is evaluated under the Fourth Amendment. *Bond*, 981 F.3d at 815. Such a claim requires a showing that a seizure occurred and that the seizure was unreasonable. *Id.* Apprehension of a subject through the use of deadly force is a seizure. *Id.*

"Reasonableness is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). It is an objective standard judged on the totality of the circumstances. *Id.* Reasonableness does not require that officers use alternative or less intrusive means if the conduct is otherwise reasonable. *See Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001). Officers are required to make split-second judgment calls on the scene, and it is not the role of a court to judge an officer's conduct with the benefit of hindsight. *Id.*; *see also Fry ex rel. Estate of Fry v. City of Galena, Kan.*, 450 F. Supp. 2d 1236, 1241-42 (D. Kan. 2006).

The use of deadly force is not unreasonable if a reasonable officer had cause to believe there was a serious threat to themselves or to others. *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995). Ultimately, the Supreme Court has identified three factors that should be considered in evaluating the reasonableness of the use of force: (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade officers. *Graham*, 490 U.S. at 396.

### a.    Use of Force at the Moment of the Shooting

The Court first considers whether Sweany, Miller, Mills, and Peterson acted reasonably at the moment of the shooting. *See Medina*, 252 F.3d at 1132 ("The primary focus of our inquiry,

therefore, remains on whether the officer was in danger at the exact moment of the threat of force.").

The first *Graham* factor looks to the severity of the crime. *Graham*, 490 U.S. at 396. Here, Howard had warrants for felony supervision violations and aggravated escape from custody. Execution of the warrants was precipitated by a 911 call expressing concern that Howard was in the house where children lived, and that Sumners did not want her there. While this doesn't reflect the most severe of crimes, these are not minor legal issues. This factor is therefore neutral.

The second *Graham* factor is the immediacy of the threat to the safety of officers or others. *Id.* Courts consider additional non-exclusive factors in evaluating the immediacy of the threat, including whether the officers ordered the suspect to drop the weapon, whether any hostile motions were made with the weapon toward officers, the distance between the officers and the suspect, and the manifest intentions of the suspect. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *Bond*, 981 F.3d at 820.

Applying these additional factors to this case suggests the officers faced a very real and immediate threat upon entering the laundry room. The Court reviewed the body camera footage of the encounter between the officers and Howard, which generally reflects the undisputed facts. *See Bond*, 981 F.3d at 814-15. It is difficult to watch. It shows a very tense 13-second standoff between the officers and Howard. When the officers entered the laundry room, Howard was holding a gun and moving it around erratically, with the gun often pointing in the general direction of the officers. At one point Howard appears to rack the slide of the gun, possibly chambering a round. The officers shouted at her for 13 seconds to drop the gun. Howard did not comply, and although it is difficult to hear exactly what is being said on the video, Howard clearly was defiant. Plaintiff's own expert states that Howard yelled, "I'll take every single one of you." At that point she grabbed

the gun with both hands and pointed it in the direction of the officers. The officers then fired and killed Howard.

During this time period, Howard clearly posed a real and immediate threat to the officers' safety. Indeed, it is undisputed that Sweany, Miller, and Peterson fired their guns in self-defense. Doc. 243 at 7. Plaintiff's own expert has expressed the opinion that "at the moment the officers used deadly force, there was an immediate threat of death or serious bodily injury to the officers and . . . deadly force was objectively reasonable and consistent with generally accepted police practices." Doc. 257 at 19; Doc. 261 at 38; Doc. 279 at 59; Doc. 280 at 34. Accordingly, the second *Graham* factor weighs in the officers' favor.

The third *Graham* factor is whether the suspect was trying to evade or resist officers. *Graham*, 490 U.S. at 396. Here, Howard had barricaded herself in the house or laundry room for several hours and resisted multiple orders to come out. Indeed, in the approximately 16 minutes that the officers were in the house, the officers entreated her to come out of the laundry room at least 35 times. She never complied. This factor weighs in favor of the officers as Howard was actively resisting the officers' attempts to arrest her on her outstanding warrants and remove her from the house.

Given this analysis, the officers' use of force at the moment of the shooting was reasonable.

### b.    Reckless Conduct Creating Need to Use Deadly Force

There is seemingly little dispute among the parties that the officers' use of force at the moment of the shooting was reasonable. But the parties diverge on whether the Court ought to consider the officers' earlier conduct or decisions leading up to their entry into the house.

Plaintiff argues that the Court must examine the totality of the circumstances, which includes consideration of whether the officers' reckless conduct before the actual seizure in the

laundry room unreasonably created a need to use deadly force. Specifically, Plaintiff contends that the officers "recklessly created a lethal situation by loudly and violently accosting an impaired and likely armed Howard in the confined space of Sumners' laundry room" and "[o]nce they entered the house and chose to proceed towards a face-to-face altercation, the die was cast and the encounter was destined to turn deadly." Doc. 280 at 64; *see also* Doc. 279 at 90. Plaintiff argues the officers "recklessly created a lethal situation" because they forced a confrontation knowing the following:

- Howard was impaired and her behavior was consistent with mental illness;

- Howard had a history of suicide and had made suicidal comments;

- Howard was known to be likely armed and it was assumed she had a loaded gun;

- requests for tactical teams were rejected because of the high risk of injury or death;

- Howard never threatened anyone outside of the residence;

- it was known that a tactical team, if deployed, would not make armed entry into the house;

- Defendants expressed doubt about whether they should enter;

- Defendants knew the risk of injury or death increased if they entered the house; and

- Plaintiff's expert has opined that the officers' actions were unreasonable, reckless, and inconsistent with prevailing police practices.

Doc. 280 at 66-72; *see also* Doc. 279 at 91-99. Defendants contend it is not appropriate to review the officers' conduct in the hours preceding the use of force, and the Court can only consider pre-seizure conduct that is "immediately connected" to the actual use of force.

Tenth Circuit caselaw counsels that the reasonableness analysis can consider "whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Bond*, 981 F.3d at 816 (quoting *Sevier*, 60 F.3d at 699). Accordingly, in the Tenth Circuit, courts apply the *Graham* factors both to the precise moment that deadly force is used and to conduct "immediately connected" to the use of deadly force. *Id.* In other words, a court will consider whether reckless or deliberate conduct unreasonably created the need to use such force, but the allegedly reckless conduct must also be "immediately connected" to the use of force. *See Medina*, 252 F.3d at 1132 ("We emphasize, however, that, in order to constitute excessive force, the conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than negligence." (emphasis added)). Such "immediately connected" conduct must be reckless; merely negligent behavior is not actionable. *See Pauly*, 874 F.3d at 1220.[8]

As detailed above, there doesn't seem to be any dispute among the parties that what transpired during the 13 seconds from the time officers entered the laundry room until they shot Howard is conduct "immediately connected" to the actual use of force. The question is whether any conduct before then is "immediately connected" to the confrontation in the laundry room.

Most of Plaintiff's arguments on this point focus on how the officers' conduct was reckless, but not on whether it was "immediately connected" to the use of force in the laundry room. Plaintiff only contends that "immediate" in this context is relative and is a case-by-case fact-intensive

---

[8]   In *County of Los Angeles v. Mendez*, the Supreme Court overruled the Ninth Circuit's "provocation rule," which permitted an excessive force claim "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment Violation." 137 S. Ct. 1539, 1546 (2017). But the Supreme Court explicitly declined to consider the question of whether courts should take "into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it." *Id.* at 1547 n.*. The Tenth Circuit has subsequently noted that "the concept that pre-seizure conduct should be used in evaluating the reasonableness of an officer's actions is not universally held among other circuits," but the Supreme Court declined to resolve the issue and therefore Tenth Circuit precedent on this issue remains good law. *Pauly*, 874 F.3d at 1219 n.7.

determination. Doc. 279 at 90-91; Doc. 280 at 65. But Plaintiff doesn't offer any analysis about what "immediate" should mean in this case—he just argues that it should <u>not</u> be based solely on time. Doc. 279 at 91; Doc. 280 at 65.

There has not been much discussion in the caselaw of what conduct is considered "immediately connected" to the use of deadly force. The Tenth Circuit has stated that "if the preceding events . . . <u>are attenuated by time or intervening events</u>, then they are <u>not</u> to be considered in an excessive force case." *Sevier*, 60 F.3d at 699 n.8 (emphasis added). The "primary focus . . . remains on whether the officer was in danger at the <u>exact moment</u> of the threat of force" *Medina*, 252 F.3d at 1132 (emphasis added). Thus, contrary to Plaintiff's position that time should not be the deciding factor, this standard suggests that time <u>is</u> a key consideration, although events close in time but separated by intervening events may ultimately <u>not</u> factor in the analysis.

To this point, the Tenth Circuit has declined to consider "events that occurred approximately one hour prior to [the] actual seizure to determine if the seizure was reasonable" because the Fourth Amendment prohibits unreasonable <u>seizures</u>, and not "unreasonable or ill-advised conduct in general." *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994). In *Estate of Ronquillo v. City and County of Denver*, officers approached a suspect in his parked vehicle and blocked him with their cars. 720 F. App'x 434, 436 (10th Cir. 2017). The plaintiff alleged that officers tried to forcibly remove the suspect from the vehicle, and then five seconds later, the suspect tried to escape, first by driving backwards and then "[s]everal seconds later" by driving forward directly toward some officers. *Id.* at 436-37. At that point, officers shot and killed the suspect. *Id.* at 437. The court rejected the argument that the initial use of force in trying to remove the suspect from the car created the need for the subsequent deadly force, finding that "the officers' initial attempts to extract [the suspect] were too attenuated to support that theory of causation,"

because the suspect had time to back the car up, stop, put the car in drive, and then drive forward. *Id.* at 439. In other words, actions just several seconds removed, but during which the suspect took offensive actions against the officers, were deemed too attenuated. *See id.* at 439-40.

In *Fry v. City of Galena, Kansas*, a District of Kansas case, a suspect was shot after a two-hour standoff that culminated in officers entering the house and confronting the suspect who had barricaded himself in a room. 450 F. Supp. 2d at 1237-39. The plaintiff argued that officers had unreasonably escalated the situation by surrounding the house, shining bright lights, failing to use a neutral negotiator, entering the house, and failing to use non-lethal attempts to subdue the suspect. *Id.* at 1242. But regarding events before entry into the house, those events "occurred during the one and a half hour timespan prior to [the suspect's] threat of force [and were therefore] not 'immediately connected' in this situation . . . ." *Id.* at 1242-43.[9]

In contrast, Plaintiff relies heavily on *Bond v. City of Tahlequah*. *Bond* reiterates that the totality of the circumstances includes "immediately connected actions by the officers that escalated a non-lethal situation to a lethal one," stating that the totality-of-the-circumstances analysis will consider "the full encounter, from its inception through the moment the officers employed force." *Bond*, 981 F.3d at 818. In *Bond*, officers responded to a 911 call from a woman who said her ex-husband was drunk and in her garage and she wanted him gone. *Id.* at 812. Officers responded and briefly spoke with the woman and the husband. *Id.* at 812-13. The ex-husband was fidgeting, and at one point, an officer stepped toward the ex-husband and asked to frisk him. *Id.* at 813. The ex-

---

[9]   Although *Fry* found these events not "immediately connected" to the use of force, it nevertheless considered whether they rose to the level of recklessness. *Fry*, 450 F. Supp. 2d at 1243. The court found that it had not located "any case law indicating that such actions are objectively unreasonable, much less reckless, under these circumstances." *Id.* at 1243. The Court notes that Plaintiff makes similar arguments about reckless conduct in this case. The Court also notes that, in *Fry*, the court found that, "[b]ecause entry into the house directly preceded the threat of force by Mr. Fry, the court concludes it is 'immediately connected'" to the use of force. *Id.* But it is unclear from the facts of *Fry* how much time passed between officers' entry into the house and the deadly shooting. As explained below, here, the Court finds that the decision to enter the house is separated by sufficient time and intervening events to not be considered "immediately connected" to the use of force.

husband refused. An officer then stepped toward the ex-husband, who in turn retreated into the garage with other officers following. *Id.* Inside the garage, the ex-husband grabbed a hammer. *Id.* After a brief confrontation, the ex-husband pulled the hammer back behind his head, and officers shot and killed him. *Id.* at 814. The full encounter took less than a minute and was "properly considered as part of the totality of the circumstances." *Id.* at 823.

*Bond* primarily relied on three cases in reaching this holding. *Id.* at 818. The first, *Allen v. Muskogee, Oklahoma*, involved a 911 call about an individual threatening suicide. 119 F.3d 837, 839 (10th Cir. 1997). The officers found the individual sitting in a car and holding a gun. *Id.* Officers approached the vehicle—some witnesses said the officers ran up to the car screaming—and one tried to reach in and grab the gun. *Id.* at 839, 841. The individual reacted by pointing the gun toward the officers, who then shot and killed the individual. *Id.* at 839. The entire encounter lasted 90 seconds. *Id. Allen* held that the reasonableness inquiry should include both the precise moment force was used and whether reckless conduct created the need to use such force. *Id.* at 840. Noting that the incident took only 90 seconds, "[c]learly, the officers' preceding actions were so 'immediately connected' to [the decedent's] threat of force that they should be included in the reasonableness inquiry." *Id.* at 841.

The second case relied on by *Bond* was *Estate of Ceballos v. Husk.* 919 F.3d 1204 (10th Cir. 2019). There, a caller reported that her husband was in the driveway with a baseball bat acting crazy, and that he was probably drunk or on drugs. *Id.* at 1208-09. When officers arrived, the husband was alone in the driveway swinging the bat and yelling. *Id.* at 1210. Officers yelled for him to drop the bat, but when he began walking toward the officers with the bat still in his hands, officers shot him. *Id.* at 1210-11. The shooting occurred within a minute of the officers arriving on scene. *Id.* at 1216.

The third case relied on was the unpublished decision in *Hastings v. Barnes*. 252 F. App'x 197 (10th Cir. 2007). There, the decedent called Family and Children Services expressing suicidal thoughts. *Id.* at 198. Police eventually responded. The decedent initially came to the door, but then retreated into the house, and the officers followed. *Id.* at 199. The decedent retreated to a bedroom, where he picked up a Samurai sword. *Id.* After a brief stand-off, the decedent turned the sword toward the officers and began moving toward them. *Id.* at 199-200. The officers shot and killed him. The incident took less than four minutes. *Id.* at 200. The court ruled that that whether the officers' actions unreasonably precipitated the use of deadly force was a jury question given that the decedent was not a criminal suspect and that his actions were largely defensive and not aggressive. *Id.* at 203.

Despite Plaintiff's reliance on *Bond* and the cases it cited, the Court finds the facts of those cases significantly distinct from the facts of this case. Nor do these cases suggest that a court can or must evaluate <u>every</u> decision or move made by officers from the moment they arrived on scene simply because it may have a causal connection to the ultimate use of deadly force, as Plaintiff's arguments would suggest. *See Bella*, 24 F.3d at 1256.

To reconsider every action or decision taken by the officers in this case over the course of a three-hour standoff would run counter to the objective standard used in evaluating excessive-force claims, as well as the caution that courts should not view police encounters with the benefit of 20/20 hindsight. *See Graham*, 490 U.S. at 396-97; *Bond*, 981 F.3d at 815; *Larsen*, 511 F.3d at 1259-60 (stating that the use of force should be judged from an "on-scene perspective" (internal quotation and citation omitted)). Indeed, the Supreme Court has admonished that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* at 396 (internal quotation and citation omitted).

Plaintiff challenges decisions that were made throughout the course of the entire stand-off, including well before the officers entered the house. *See, e.g.*, Doc. 280 at 66-67 (challenging the use of Sumners to talk with Howard); 68 (failure of officers to contact mental health professionals). Unlike the scenarios in *Bond* and the cases it relied on, some of these events occurred an hour or more before the use of force and can hardly be said to be "immediately connected" to the use of force. *See Fry*, 450 F. Supp. 2d at 1242-43 ("Surrounding the house, shining bright lights, and failing to utilize a neutral communicator are all events that occurred well before the final confrontation . . . . Because these events occurred during the one and a half hour timespan prior to Mr. Fry's threat of force, the court concludes that they are not 'immediately connected' in this situation . . . ."). Because they are not "immediately connected" to the use of force, these decisions are not properly considered.

To the extent Plaintiff challenges the officers' decision to enter the house, *see, e.g.*, Doc. 80 at 68-71 (pointing to facts calling into question the decision to enter the house); 69-70 (questioning the decision to not employ a tactical response team),[10] Plaintiff makes no attempt to demonstrate that entry into the house was "immediately connected" to the use of force that occurred in the laundry room, other than to say that the "die was cast and the encounter was destined to turn deadly." Doc. 280 at 64; *see also* Doc. 279 at 90. But this ignores the 16 minutes that the officers were in the house negotiating with Howard. During those 16 minutes, Sweany

---

[10]   The Court acknowledges that many of the facts relied on by Plaintiff are disputed. But the Court considers the facts in a light most favorable to the Plaintiff when evaluating the first prong of the qualified-immunity analysis. *Olsen*, 312 F.3d at 1312. Ultimately, however, the Court finds that these facts are not material to the analysis because they touch on things not immediately connected to the use of force.

implored Howard to come out at least 35 times. He spoke with her about her warrants, where she would be taken if she surrendered, and about her ability to bond out if arrested. During that time, officers were also able to see Howard's hands at times, which were empty. She made no overt threats toward anyone.

It wasn't until the few seconds before the use of force—when Howard's demeanor changed, and she slammed the door—that the standoff turned urgent. Although the decision to enter the house ultimately led to the confrontation in the laundry room in a strictly factual sense, time and the intervening events separate it from the use of force, and the decision to enter the house is not properly considered as an event "immediately connected" to the shooting in the laundry room. *See Sevier*, 60 F.3d at 699 n.8. (noting that "if the preceding events are merely negligent <u>or if they are attenuated by time or intervening events</u>, then they are not to be considered in an excessive force case").[11]

The only argument made by Plaintiff about actions arguably close in time to the shooting is that officers were aware of Howard's agitation, irrational behavior, and suicidal history, which made "a deadly encounter a certainty if they entered <u>the laundry room</u>." Doc. 280 at 67 (emphasis added). As discussed above in Section III.A.1.a., the Court has considered the reasonableness of the officers' actions from the time they entered the laundry room—an action undoubtedly "immediately connected" to the use of force. But to the extent Plaintiff contends that Howard's mental status made the decision to actually enter the laundry room reckless or unreasonable, the Court disagrees.

---

[11]   The Court does not imply that the decision to enter the house, or any of the conduct cited by Plaintiff, was in fact reckless. *See Sevier*, 60 F.3d at 699 n.8. The Court does not reach this issue at all because, even if the conduct was reckless, Plaintiff has not demonstrated that it was "immediately connected" to the use of force in the laundry room.

It's correct that "[t]he mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation." *Estate of Ceballos*, 919 F.3d at 1214 (noting the district court's correct statement of the law). But it is only one consideration. *Clark v. Colbert*, 895 F.3d 1258, 1264 (10th Cir. 2018). And it does not change the outcome here.

The Court notes that Plaintiff's argument treads close to suggesting that it is <u>always</u> unreasonable for an officer to confront a mentally ill suspect. Such a per se rule is not in keeping with the law that the mental instability of an individual is just one factor to consider. *See id*. Further, the fact that Howard was agitated, irrational, or suicidal does not support a conclusion that a deadly encounter was a certainty if the officers entered the laundry room, nor does the fact that Howard likely had access to a gun. To the contrary, the undisputed facts shows that the officers engaged Howard in conversation for 16 minutes before entering the laundry room (in addition to the hours of negotiations that had already occurred outside). During that time, she made no overt threats to herself or anyone else. And it is undisputed that when she initially opened the door, the officers saw that her hands were empty. The decision to enter the laundry room came only after the officers perceived a shift in her demeanor suggesting that she was potentially planning take some immediate action against the officers, and it was not possible for the officers to safely retreat given the confines of the house. *Cf. Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1320 (10th Cir. 1998) (finding as reasonable a decision to enter an apartment where the officers had spent hours trying to resolve the matter through non-confrontational communication and had a court order authorizing entry). Plaintiff's own expert indicated he would not expect officers to continue negotiating with a barricaded subject indefinitely. Under these facts, the Court does not

find that it was reckless for the officers to enter the laundry room to try to subdue Howard and end the standoff, even considering her mental state.

In sum, the Court finds that, after evaluating the relevant conduct of the officers, the use of deadly force was reasonable under the circumstances. No reasonable jury could conclude otherwise. Accordingly, Plaintiff has not shown that there was a constitutional violation. Sweany, Miller, Mills, and Peterson are therefore entitled to qualified immunity.

### 2.      Qualified Immunity – Clearly Established Authority

To avoid a qualified-immunity defense, Plaintiff must not only show that the facts demonstrate a constitutional violation, but also that the violation was clearly established under Tenth Circuit or Supreme Court precedent. *See Pauly*, 874 F.3d at 1222. As detailed above, the Court finds that Plaintiff has not demonstrated that a constitutional violation occurred. But even if he had, the Court would still find the officers are entitled to qualified immunity because Plaintiff has not identified any precedent that would have put the officers on notice that their actions violated the law.

To defeat a qualified-immunity defense, a plaintiff must not only show that there was a constitutional violation, but also that the conduct violates clearly established law. *Id.* Specifically, if at the time of the conduct, the contours of the right are clear and a reasonable officer would have known that his actions violates the right, the officer is not entitled to qualified immunity. *See id.* There need not be a case that is factually identical. *Id.* But "existing precedent must have placed the statutory or constitutional question beyond debate" *Id.* (internal quotation and citation omitted). "[S]pecificity is especially important in the Fourth Amendment context, where . . . [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation and

citation omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 13).

Plaintiff contends that "it was clearly established that a suspect's Fourth Amendment right is violated and an officer's actions are unreasonable when he or she aggressively confronts an armed, suicidal, and emotionally disturbed or impaired individual by approaching him or her in a threatening manner with a display of force." Doc. 279 at 104; Doc. 280 at 73. In support, Plaintiff cites to *Bond*, though acknowledging that *Bond* was not decided until three years after Howard's death. Rather, Plaintiff argues that the law was clearly established at the time Howard was killed in 2017 because the events in *Bond* occurred in 2016—a year before Howard's death—and *Bond* relied on two Tenth Circuit cases from 1995 and 1997. Doc. 279 at 104-05; Doc. 280 at 74.

The cases *Bond* relied on are *Allen* and *Sevier*. *See Bond*, 981 F.3d at 825. As detailed above, *Allen* involved a 90-second encounter where officers approached an armed individual in a car, perhaps aggressively so, and tried to reach in and grab his gun, which led to the officers shooting the individual. 119 F.3d at 839-41. In *Sevier*, the decedent's parents were concerned he was suicidal and called police for assistance in the middle of the night. 60 F.3d at 697. Officers arrived and confronted the decedent in his bedroom. *Id.* at 698. The decedent emerged from his bedroom holding a knife. *Id.* After a brief standoff, the decedent allegedly lunged with the knife in striking position, and officers shot and killed him. *Id.* The entire encounter took less than five minutes. *Id.* Plaintiff also relies on *Hastings*, though acknowledging it is unpublished and is of limited value as notice to the officers. Doc. 279 at 105; Doc. 280 at 75. As explained above,

*Hastings* involved a four-minute stand-off with a suicidal individual armed with a Samurai sword. 252 F. App'x at 199-203.

The Court disagrees that these cases are factually similar enough to put the officers on notice that their conduct violated Howard's clearly established constitutional rights. Plaintiff contends these cases clearly establish that officers act unreasonably when they aggressively confront an armed and mentally unwell individual. Even accepting that these cases clearly establish such a point, they are still factually inapposite to what occurred here. The cases relied on by Plaintiff all involved tense and short-lived standoffs lasting just minutes or seconds, with no intervening events from the officers' arrival on scene to the use of deadly force. Plaintiff's claim, by contrast, is premised on alleged police missteps over the course of three hours. As the Tenth Circuit held in *Pauly*, *Allen*'s holding that the reasonableness inquiry includes an evaluation of an officer's actions leading up to the use of force is relevant to determining whether excessive force was used but "it cannot alone serve as the basis for concluding that an officer's particular use of excessive force was 'clearly established' . . . because the facts are completely different." *Pauly*, 874 F.3d at 1223; *see also Bond*, 981 F.3d at 825 ("*Allen* established that applying lethal force after deliberately or recklessly manufacturing the need to do so <u>in such a scenario</u> is a constitutional violation." (emphasis added)); *see also Kisela*, 138 S. Ct. at 1153 ("Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.").

In determining whether the law is clearly established, "the dipositive question is whether the violative nature of <u>particular</u> conduct is clearly established." *Pauly*, 874 F.3d at 1222 (emphasis in original) (internal quotation and citation omitted). But Plaintiff does not direct the Court to any

cases demonstrating that the factual circumstances of this case were clearly unconstitutional. Accordingly, the Court finds that, even if Plaintiff could demonstrate a constitutional violation, Sweany, Miller, Mills, and Peterson would still be entitled to qualified immunity because Plaintiff has not demonstrated that their conduct violated clearly established law.[12]

### B.    Counts 3 and 4 – Supervisory and *Monell* Liability Against Chaulk and Olathe

In addition to the excessive-force claims against Sweany, Miller, Mills, and Peterson stemming from their role in the shooting of Howard, Plaintiff also asserts § 1983 claims against Chaulk, who was Peterson's supervisor, for failing to supervise Peterson or failing to intervene to stop the other officers from using excessive force (Count 3), and against the City of Olathe (which employed Sweany, Miller, and Mills) for creating policies or practices that necessitated the use of excessive force by its employees (Count 4).[13] Doc. 243 at 19.

As explained above, Sweany, Miller, Mills, and Peterson did not use excessive force. Accordingly, no constitutional violation occurred. A supervisor cannot be liable for failing to supervise or failing to intervene where there is no underlying constitutional violation. *Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty., Okla.*, 978 F.3d 1165, 1174-75 (10th Cir. 2020). Likewise, "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton*, 997 F.2d at 782. Here, the Court has determined that Sweany, Miller, Mills, and Peterson did not use excessive force against Howard. This finding that

---

[12]   In ruling on a motion to dismiss, Judge Carlos Murguia, who was previously assigned to this case, ruled that *Allen* and *Hastings* put the officers on notice that shooting Howard under the circumstances they faced would be a violation of the Fourth Amendment. Doc. 68 at 22. But that finding was based on the conclusion that Plaintiff had pleaded facts showing that officers entered both the house and the laundry room in a way that recklessly escalated the confrontation. *Id.* On the more developed summary-judgment record, the undersigned concludes that Plaintiff has not demonstrated that those cases are factually analogous to the situation here.

[13]   A municipality cannot be held liable under § 1983 on a theory of respondeat superior. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Rather, a municipality can only be held liable for the actions of its employees if the controversial action was taken pursuant to an official policy of the municipality. *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

the officers did not violate Howard's Fourth Amendment rights precludes imposing any liability against Chaulk or the City of Olathe. *See id.*; *see also Fry*, 450 F. Supp. 2d at 1246.[14] Accordingly, Chaulk is entitled to summary judgment on Count 3 and the City of Olathe is entitled to summary judgment on Count 4.

### C.    Count 5 – State-Law Assault and Battery Against Sweany, Miller, Mills, and Peterson

Plaintiff asserts state-law assault and battery claims against Sweany, Miller, Mills, and Peterson. Doc. 243 at 19. In response, Defendants point to K.S.A. § 21-5227(a). That statute states:

> A law enforcement officer, or any person whom such officer has summoned or directed to assist in making a lawful arrest, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. Such officer is justified in the use of any force which such officer reasonably believes to be necessary to effect the arrest and the use of any force which such officer reasonably believes to be necessary to defend the officer's self or another from bodily harm while making the arrest. However, such officer is justified in using deadly force only when such officer reasonably believes that such force is necessary to prevent death or great bodily harm to such officer or another person, or when such officer reasonably believes that such force is necessary to prevent the arrest from being defeated by resistance or escape and such officer has probable cause to believe that the person to be arrested has committed or attempted to commit a felony involving death or great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that such person will endanger human life or inflict great bodily harm unless arrested without delay.

The Kansas Supreme Court applies this statute equally in civil or criminal contexts. *Dauffenbach v. City of Wichita*, 667 P.2d 380, 387 (Kan. 1983).

---

[14]   The Court has found that Sweany, Miller, Mills, and Peterson are entitled to qualified immunity. Qualified immunity does not apply to municipalities, and a municipality is not shielded from liability where its employee is granted qualified immunity based only on the second prong of that analysis, clearly established law. *Hinton*, 997 F.2d at 782-83. But where an individual officer is entitled to qualified immunity because the conduct did not amount to a constitutional violation, that is akin to a decision on the merits of a plaintiff's claim. *Id.* at 783. "In such a case, a finding of qualified immunity may preclude the imposition of any municipal liability." *Id.*

The parties acknowledge that this claim, like the excessive-force claim, turns on whether the officers' actions were reasonable. Doc. 299 at 50 ("The parties generally agree that analysis of the privilege issue is duplicative of the analysis of whether the force used was constitutionally reasonable."); *see also* Doc. 261 at 66; Doc. 279 at 108; Doc. 280 at 81. Here, the Court has determined that the officers acted reasonably in their use of deadly force. At the time of the shooting, officers were trying to arrest Howard. It is also undisputed that, at the time they fired their guns, the officers were acting in self-defense.[15] Accordingly, the Court concludes Sweany, Miller, Mills, and Patterson are entitled to summary judgment on the state-law assault and battery claims. *See Fry*, 450 F. Supp. 2d at 1246 ("In light of this statute and the courts' earlier determination that the defendants acted reasonably in using deadly force under the circumstances, the court concludes that the defendants were privileged in their use of force against Mr. Fry and therefore are not liable for a wrongful death cause of action premised on battery.").[16]

### D.      Count 6 – State-Law Wrongful-Death Claim Against All Defendants

Plaintiff finally asserts a state-law wrongful-death claim against all Defendants. Doc. 243 at 19. Under Kansas law, a wrongful-death claim must be pursued by the heirs-at-law of the decedent. K.S.A. § 60-1902 ("The action may be commenced by any one of the heirs at law of the deceased who has sustained a loss by reason of the death."); *see also Johnson v. McArthur*, 596 P.2d 148, 153 (Kan. 1979); *Hembree v. Tinnin*, 807 F. Supp. 109, 110 (D. Kan. 1992) ("Under

---

[15] Plaintiff suggests there is a disputed issue of material fact regarding whether Sweany, Miller, Mills, and Peterson acted in self-defense because Miller testified that Howard did not "pull" her gun on the officers and only pointed it in their direction as she was waiving it around. This does not create a genuine issue of material fact regarding whether the officers acted in self-defense. Regardless of how Plaintiff parses any testimony, it is a stipulated fact that Sweany, Miller, and Peterson fired their guns at Howard in self-defense. Doc. 243 at 7.

[16] *Dauffenbach* and *Fry* discussed K.S.A. § 21-3215(1), a prior and substantively similar version of K.S.A. § 21-5227(a).

Kansas law, a surviving widow of the decedent is the heir at law, and the parents of the decedent may not commence a wrongful death action.").

Defendants move for summary judgment on Plaintiff's wrongful-death claim because Plaintiff, as Howard's stepfather and special administrator of her estate, is not the proper party to assert a wrongful-death claim under Kansas law. It is undisputed that Plaintiff is not Howard's heir. Howard's heirs are her four minor children, who were not made parties to this case.[17]

Plaintiff's response briefs state that he makes no argument in response to Defendants' motions regarding the wrongful-death claim. Doc. 279 at 112 n.24; Doc. 280 at 82 n.4. Based on this and based on the undisputed fact that Plaintiff is not Howard's heir capable of sustaining a wrongful-death claim, the Court grants Defendants' motion as to Count 6.

### E. Plaintiff's *Daubert* Motions

As outlined above, the Court finds Defendants are entitled to summary judgment on all claims. Thus, the Court finds that Plaintiff's *Daubert* motions (Docs. 252 and 254) are moot.

## IV. CONCLUSION

The Court finds that the individual officers are protected by qualified immunity because Plaintiff has not demonstrated that they unreasonably used deadly force or that their conduct violated a clearly established constitutional right. Because there was no constitutional violation by the officers, the supervisory and *Monell* claims also fail. Likewise, the officers are entitled to summary judgment on Plaintiff's state-law claim for assault and battery because their conduct was

---

[17] Plaintiff previously sought to substitute the guardian ad litem of the minor children as a plaintiff in this case. Magistrate Judge James P. O'Hara recommended denying this request because Plaintiff failed to show good cause for the delay in adding the children as parties. The undersigned adopted Judge O'Hara's recommendation because Plaintiff identified Howard's heirs in 2018 and a previous order from September 2019 had suggested the heirs may need to be added to the case. *See Arnold v. City of Olathe, Kansas*, 413 F. Supp. 3d 1087, 1100 (D. Kan. 2019) (noting that Plaintiff "is not an heir-at-law capable of bringing a wrongful death action"). But no action was taken until December 2020, and Plaintiff failed to identify the procedural vehicle for substituting the children as plaintiffs. *See* Doc. 240 at 5.

reasonable and thus privileged under state law. Finally, Plaintiff is not the proper party to assert a wrongful-death claim. Accordingly, the Court enters summary judgment in favor of Defendants on all claims. Plaintiff's motions to exclude expert testimony are therefore denied as moot.

THE COURT THEREFORE ORDERS that Olathe Defendants' Motion for Summary Judgment (Doc. 256) and Johnson County Defendants' Motion for Summary Judgment (Doc. 260) are GRANTED. Judgment is to be entered in Defendants' favor on all claims.[18]

THE COURT FURTHER ORDERS that Plaintiff's Motions to Exclude (Docs. 252 and 254) are DENIED AS MOOT AND WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: July 23, 2021                    /s/ *Holly L. Teeter*
                                        HOLLY L. TEETER
                                        UNITED STATES DISTRICT JUDGE

---

[18]   Because the Court dismisses all claims, Plaintiff's demand for punitive damages is likewise denied.